595 A.2d 1232

Ronald J. AMODEO and Kimberly Amodeo

v.

RYAN HOMES, INC., a Corporation
Pleasant Valley Land Co.,

Appeal of RYAN HOMES, INC., a Corporation.

Ronald J. AMODEO and Kimberly Amodeo

v.

RYAN HOMES, INC., a Corporation

v.

PLEASANT VALLEY LAND CO., Appellant.

Superior Court of Pennsylvania.

Argued April 16, 1991.

Filed Aug. 7, 1991.

Joseph M. Ramirez, Pittsburgh, for appellant in No. 1613 and for Ryan Homes, appellee in No. 1619.

Michael J. Seymour, Bethel Park, for Amodeo, appellees.

Before McEWEN, FORD ELLIOTT and CERCONE, JJ.

FORD ELLIOTT, Judge:

These related appeals are from the September 21, 1990 order of the Court of Common Pleas of Allegheny County denying the Motions for Post–Trial Relief by Ryan Homes, Inc., and Pleasant Valley Land Company, Inc., and entering judgment on the non-jury order dated April 16, 1990.

The equity action giving rise to this appeal was initiated by Ronald and Kimberly Amodeo against Ryan Homes, Inc., to recover damages, or in the alternative to rescind the contract for the purchase of their house, due to defective construction and/or fraud which resulted in acid mine drainage water infiltrating the basement of their house. Ryan Homes, in turn, joined Pleasant Valley Land Company, Inc., as an additional defendant. Pleasant Valley was the developer of the plan of lots upon which the Amodeo house was constructed by Ryan Homes.

In June of 1980, the Amodeos met with a sales representative from Ryan Homes regarding the selection and construction of a new house. The sales representative directed their attention to a new development in South Park Township known as "Village of Knot Hole Plan No. 1." After reviewing several different models, the Amodeos selected a model constructed by Ryan Homes known as the Chamberlain. This model was selected, according to the Amodeos, because it had only a single-car garage, allowing more

space for a larger game-room in the basement of the house. The Amodeos had stressed to the Ryan Homes' representative that it was very important to them to have a very large game-room since they were planning to raise a family in the house. In furtherance of those plans, the Amodeos selected certain options in the construction which would ultimately lead to a finished game-room, such as additional electrical outlets, fixture boxes, phone jacks, and plumbing connections for a bathroom.

Ryan Homes designed and constructed the Chamberlain model home for the Amodeos and in doing so, installed in the foundation and basement floor of the home both an exterior and interior drainage system to handle subsurface water. The exterior drainage system was gravity operated whereas the interior system functioned with a sump pump which was needed to pump the water from the floor to the height of the basement wall in order to allow water to exit the front of the house. At the preclosing inspection the Amodeos were told, for the first time, of the existence of the sump pump. Tim Merkill, of Ryan Homes, told the Amodeos just to forget about the sump pump, that it was nothing for them to worry about.

On September 5, 1980 the Amodeos closed on their house. Approximately six months later they began to notice water accumulating on the basement floor. The Amodeos immediately contacted Ryan Homes, and Tim Merkill was sent to investigate the complaint. Mr. Merkill flushed the sump pump and crock with a water hose and indicated the Amodeos would need to do the same from time to time to prevent any future problems with water accumulating on the basement floor.

Over the next six years, the water problem in the Amodeo house worsened. The basement walls remained damp and discolored. The basement pipes clogged and deposits of orange-colored sludge appeared on the basement floor as well as in the crock. Ryan Homes was contacted repeatedly during that period and attempted several methods to cure the problem. The original sump pump was replaced with a

larger, commercial pump. The interior drainage system was also redesigned to include cleanouts and larger pipes. All of the attempts to correct the problem by Ryan Homes provided temporary relief, but never cured the problem. The Amodeos eventually contacted the Pennsylvania Department of Environmental Resources, the U.S. Department of Surface Mining, and South Park Township officials. Tests performed by the DER. indicated that the nature of the water being received by the Amodeo residence was acid mine drainage. Township officials informed the Amodeos that such water was not acceptable in their surface water drainage system.

Since Ryan Homes was not able to offer any further alternatives that could possibly cure the problems, the Amodeos finally filed a lawsuit on September 9, 1987, seeking to either rescind the contract or in the alternative, recover damages.

The non-jury trial resulted in a verdict in favor of the Amodeos in the amount of $32,500.00 as the costs to repair the house, along with an additional $17,288.92 in attorney's fees and other costs associated with bringing the lawsuit.

Both Ryan Homes, Inc., and Pleasant Valley Land Company, Inc., filed timely motions for post-trial relief, which were subsequently denied. These timely appeals followed.

Ryan Homes, Inc., appellant at No. 1613 Pittsburgh 1990, raises the following issues for our consideration.

 I. Does the statute of limitations bar a claim of breach of warranty of habitability that was discovered by plaintiffs more than four years before they commenced the action?

 II. Are damages for breach of a construction contract limited to the diminution in market value of the property when the cost of repair greatly exceeds the loss of value?

 III. Must plaintiffs who have prevailed on a claim for breach of implied warranty of habitability bear their own attorney fees and litigation expenses?

IV. Is a developer of property that is obligated to deliver lots suitable for construction of homes solely responsible for any damages caused by an unsuitable lot?

Pleasant Valley Land Company, Inc., appellant at No. 1619 Pittsburgh 1990, likewise raises four issues for our consideration. Pleasant Valley's first three issues are identical to those posed by Ryan Homes.[1] Their fourth issue questions whether it is the builder who is solely liable for plaintiffs' damages for building on a lot which was unsuitable for construction.

We shall address Ryan Homes' first three issues separately, and then consider both appellants' final issues together.

■ Regarding the first issue raised by Ryan Homes, it is their position that the Amodeos' claims were barred by the applicable statute of limitations. Although the Amodeos filed a five-count complaint, they recovered only on their theory of breach of implied warranty of habitability. The appropriate limitations period for such a claim is set forth at 42 Pa.C.S.A. section 5525, which provides in pertinent part that "[t]he following actions and proceedings must be commenced within four years: (1) an action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures ..."
In applying this statute under these circumstances it was necessary for the trial court to resort to the discovery rule. The discovery rule requires a determination as to when a plaintiff knows of or should know of the injury he has sustained. *See Levenson v. Souser*, 384 Pa.Super. 132, 557 A.2d 1081 (1988). In this case that would mean when the Amodeos knew or should have known that their house was uninhabitable by reason of the water problem in the basement. The discovery rule does apply to cases involving

1. Pleasant Valley, with respect to the first three issues, merely incorporates by reference in its brief the arguments presented by Ryan Homes in its brief. Thus, our disposition of those issues with respect to Ryan Homes will also apply to Pleasant Valley Land Company, Inc.

defective construction. *See A.J. Aberman, Inc. v. Funk Building Corp.,* 278 Pa.Super. 385, 420 A.2d 594 (1980). Applying the discovery rule to the facts of the case, the trial court concluded that "[c]ommunication between the Amodeos and Ryan Homes continued until January of 1987 during which time Ryan Homes manifested a commitment to accept responsibility for the problem." The court, therefore, found the action to be filed timely in September of 1987. Ryan Homes maintains that the trial court erred in reaching such a conclusion. According to Ryan Homes, the Amodeos' cause of action accrued in March of 1981 when they first noticed water in their basement. Since the suit was not filed until six years later, the argument continues, it is necessarily barred by the applicable four-year limitation period. Based upon our review of the record in this case we are inclined to agree with the trial court's conclusion that the action was not time barred, although we conclude that the action accrued at a time different from that found by the trial court.

> At the outset of our analysis we note the following: It is settled that the findings of a trial judge sitting without a jury must be accorded the same weight and effect on appeal as a jury verdict, and will not be disturbed in the absence of an abuse of discretion or a finding of lack of evidentiary support.... An appellate court, however, is not bound by the trial court's conclusions of law based on its findings of fact.... It is also clear that the party favored by the findings of the trial judge is entitled to have the evidence viewed in the light most favorable to him; that is, all the evidence and proper inferences favorable to him must be taken as true and all unfavorable inferences rejected.... This is particularly true in a case in which the credibility of witnesses must be closely evaluated.

*Concorde Investments, Inc. v. Gallagher,* 345 Pa.Super. 49, 58–59, 497 A.2d 637, 642 (1985) (citations omitted).

It is equally important to note that "[w]hether the statute has run on a claim is usually a question of law for the

judge, but where, as here, the issue involves a factual determination, i.e., what is a reasonable period, the determination is for the jury." *Smith v. Bell Telephone Co.*, 397 Pa. 134, 142, 153 A.2d 477, 481 (1959) (citations omitted). In this instance such a determination was left to the judge as the trier of fact. Viewing the evidence in a light most favorable to the Amodeos, as the party favored by the findings of the trial judge, we conclude that the trial court did not abuse its discretion in concluding that the action for breach of warranty was not time barred. Such a conclusion is supported by the record.

■ The Amodeos first noticed water in their basement in March of 1981, approximately six months after they had purchased the house. According to appellant it was on that date that the cause of action accrued, and it is from that date that the four year limitations period should be calculated. However, the initial occurrence of a leak does not necessarily put one on notice of a defect so as to give rise to a cause of action. As this court has previously noted, "[o]rdinarily, whether the first leak or leaks represented notice of a defect would be a decision for the jury." *A.J. Aberman, Inc. v. Funk Building Corp.*, 278 Pa.Super. 385, 399, 420 A.2d 594, 601 (1980). In this instance such a decision was left to the trial court as the trier of fact. The record provides ample evidence to support the trial court's finding that the cause of action did not accrue when the leak was first discovered, as argued by appellant, but rather accrued at a later date when the true problem and its scope were made known to the Amodeos.

■ While it is true that the first leak occurred approximately six months after the Amodeos closed on the house, this was not sufficient to put them on notice that their house was uninhabitable. Indeed, the Amodeos immediately contacted Ryan Homes in an attempt to have the problem corrected. Thus began a series of attempts by Ryan Homes, over a span of several years, to correct the water problem in the basement of the Amodeo house. Such attempts served to toll the running of the statute of limita-

tions under the repair doctrine. As noted in *Ranker v. Skyline Corp.*, 342 Pa.Super. 510, 493 A.2d 706 (1985), the repair doctrine has never been adopted formally in Pennsylvania. However, the doctrine has been considered in several cases. The reason the doctrine has not been adopted and applied is because, as stated by this court, "[t]here can be no estoppel merely because an attempt has been made to repair a defect. For an estoppel to arise which will toll the statute of limitations, there must also be a representation that the repairs have cured or will cure the defect." *Ranker*, 342 Pa.Super. at 516, 493 A.2d at 709, *citing A.J. Aberman, Inc. v. Funk Building Corp., supra.* The *Aberman* case involved a leaky roof in a newly-constructed shopping center. The roof was installed and the building was completed in 1965. The roof began to leak shortly thereafter. Funk Building Corporation, the general contractor, originally repaired the leaks, but in September of 1967 refused to undertake any further repairs and informed the owners to look elsewhere for relief. Thereafter, the owners hired a third party to repair the leaks from 1967 through 1973. Finally, in 1973 the owners of the shopping center had the roof replaced. The owners then filed a complaint against Funk Building Corporation in December of 1973. At the close of plaintiff's case, Funk moved for, and was granted, a compulsory nonsuit on the grounds that the action was barred by the applicable statute of limitations.

On appeal, one of the arguments raised by appellants in *Aberman* was that the repair doctrine served to toll the statute of limitations. The *Aberman* court reviewed cases from other jurisdiction which had both adopted and rejected the repair doctrine. The court then concluded that the doctrine was inapplicable in the case before it. The court reached that conclusion, in part, because plaintiff had not demonstrated that the defendant had represented that the repairs would cure the defect in the roof, and that it had relied on such representations. Viewing the repair doctrine as a form of estoppel, the court concluded these elements

would have been necessary before the doctrine could be adopted and applied.

However, this court left open the possibility that at some point in the future the repair doctrine would be adopted by the courts of the Commonwealth.

> The appellate courts of this state apparently have not yet decided whether to adopt the repair doctrine, although the federal district court in *Bobo v. Page Engineering Co.*, [285 F.Supp. 664 (W.D.Pa.1967), *aff'd*, 395 F.2d 991 (3d Cir.1968)], relying on the decision by the court of common pleas in *Lewis v. Jacobsen*, 30 Pa.D. & C.2d 623 (Erie 1962), concluded that the doctrine would be rejected. With respect to the correctness of the district court's conclusion, it should be noted that both the Supreme Court and this court have recognized that in context other than repairs, a plaintiff may show that the defendant is estopped to invoke the statute of limitations. *See Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 204 A.2d 473 (1964) (promise to settle may have lulled plaintiff into false sense of security); *Acker v. Palena*, 260 Pa.Super. 214, 393 A.2d 1230 (1978) (defendant physician's promise that vision would return); *Barshady v. Schlosser*, 226 Pa.Super. 260, 313 A.2d 296 (1973) (defendant physician's assurances that condition was temporary). *See also Walker Manufacturing Co. v. Dickerson, Inc.*, [560 F.2d 1184 (4th Cir.1977)] *supra* (settlement negotiations). Since the repair doctrine would seem nothing more than a form of estoppel, we cannot say with any degree of certainty that it would be rejected by the Supreme Court or this court.

*Aberman*, 278 Pa.Super. at 401–402, 420 A.2d at 602. Indeed, other jurisdictions which have adopted the repair doctrine have noted that the doctrine is nothing more than a particularized form of the more general doctrine of estoppel. *See Little Rock School Dist. v. Celotex Corp.*, 264 Ark. 757, 574 S.W.2d 669 (1979).

Therefore, because we view the repair doctrine as nothing more than a form of estoppel, we now adopt this

doctrine in Pennsylvania. However, we are quick to caution that the doctrine will only apply under circumstances where the evidence reveals that repairs were attempted; representations were made that the repairs would cure the defects; and the plaintiff relied upon such representations. In the present case, we find all three elements to exist. The record demonstrates that Ryan Homes attempted repairs from the time the problem first developed until July of 1985 when they wiped their hands of the entire situation. It is also apparent from the record that Ryan continually represented, with each successive repair attempt, that the problem would be corrected. Finally, Mr. Amodeo, himself, stated that he relied upon these representations and believed that the problem was going to be corrected.

Ryan Homes made numerous attempts to cure the water problem at the Amodeo house and did represent that such repairs would cure the problem. Initially, when the water was first discovered in early 1981, Mr. Merkill, of Ryan Homes, came to the Amodeo house to investigate the problem. Mr. Merkill informed the Amodeos that the problem was a clogged sump pump and he proceeded to flush out the pump with a garden hose. Mr. Merkill advised Mr. Amodeo that he would have to periodically flush the pump, and that would correct the problem.

After approximately another year of following Mr. Merkill's instructions and attempting to clean and maintain the pump, the water problem at the Amodeo house persisted, if not worsened. At that time, in March of 1982, Mr. Amodeo responded to a Ryan Homes' customer satisfaction survey by voicing his displeasure over the water problems and all the maintenance he was required to do with the sump pump. Mr. Amodeo's complaints prompted Ryan Homes to attempt another alternative to solve the problem in early 1983. Two Ryan workers broke through the cement basement floor of the Amodeo house and installed two "clean-outs" in the internal part of the floor, and also installed a different type of a pump known as a "dry sump pump." Mr. Merkill explained this new system to the Amodeos, and the condi-

tion did improve temporarily, leading the Amodeos to believe that the problem had been corrected.

However, the water problems eventually recurred, and this prompted Mr. Amodeo to contact Mr. John Smith, manager of the Pittsburgh South Division of Ryan Homes. According to Mr. Amodeo, he and Mr. Smith had numerous conversations in which several alternatives to correcting the water problem were discussed. In Mr. Amodeos own words, "He [Mr. Smith] would have meeting after meeting and discuss figures after figures with me and always led me to believe that eventually this was going to be resolved ..." (Tr. p. 79). Indeed, during this period from late 1983 throughout 1984, several more attempts were made to correct the problem. Most notably, Mr. Smith contacted the developer regarding a pipe that was under a house two lots away from the Amodeo house, and which ran under the street to a stream about one-half mile away. Mr. Smith thought he could tie into this pipe and use it as a gravity-feed relief system for the problem in the Amodeo house. A backhoe was brought in, and an area near the berm of the road was dug up in an attempt to expose that pipe. The pipe was never located, but the french drain was broken in the process and later had to be repaired.

Finally, on July 23, 1985, the Amodeos received a letter from Ryan Homes indicating that there was nothing further that they could do to resolve this problem. The letter noted that it was acid water drainage from the mines that was seeping into the house, and that Ryan was sorry but the situation could not be corrected. Clearly, it is at that point that the Amodeos' cause of action accrued.[2] Applying either the discovery rule or the repair doctrine it is clear to this court that as of July, 1985, the Amodeos' were aware of the permanent nature of the damage to their house and were further aware that Ryan was not going to undertake

2. As a matter of clarification, we note that the trial court's statement of the facts includes a settlement offer by Ryan Homes in 1983, which was rejected by the Amodeos. Our review of the record, however, reveals that this offer was not made until after the letter of July 23, 1985, and, therefore, in no way affects our disposition on this issue.

any further attempts to cure the problem. Indeed, the letter from Ryan of July 23, 1985, states that the problem could not be cured by Ryan. However, because we conclude that the cause of action did not accrue until July, 1985, we agree with the trial court that under the applicable statute of limitations the Amodeos' cause of action for breach of warranty was filed timely.

By adopting the repair doctrine, we are merely applying a specialized form of estoppel, consistent with those other contexts in which we have previously concluded that estoppel applies to toll the running of a limitations period. Again, in applying this doctrine, courts must require the existence of all three elements which are the foundation of any estoppel theory: an act (in this case, the attempted repairs), a representation (in this case, that the repairs would cure the defect), and reliance upon the representation. In situations where all three elements exist, the repair doctrine will be applied to estop a party from raising a statute of limitations defense.

Finally, the adoption of this estoppel doctrine does not run counter to or frustrate the purposes underlying statutes of limitations.

> Statutes of limitation are declaratory of the principle of the common law that the law lends its aid only to those who exercise diligence in involving it. They are expressive of the feelings of mankind that wrongs should be redressed and rights enforced without unreasonable delay. Their purpose is to stimulate diligence in looking after rights and in instituting litigation while evidence is living, fresh, and at hand, and thus avoid the uncertainties which attend investigation of aged controversies. The primary consideration underlying statutes of limitations is to expedite litigation and to preclude long delays that would be prejudicial to the person against whom the action is brought.

*Standard Pa.Prac.2d*, Chap. 13, Sec. 13:2 at 415–416. In this case, as in any case involving the proper application of the repair doctrine, there can hardly be unfair surprise or

prejudice alleged by a defendant. Furthermore, the adoption of this theory of estoppel is correct as a matter of public policy in that a party who in good faith postpones filing suit in reliance upon the other party's assurances that repairs will be effective and litigation unnecessary should not be faulted for such reliance. We as a court must consider doctrines such as this which will facilitate the attempted resolution of disputes out of court and will not close the courts to parties who have failed in their good faith efforts to resolve such disputes.

 Appellant's second issue concerns the measure of damages awarded appellees under their claim for breach of warranty of habitability. According to appellant, the method used by the trial court to calculate these damages was improper. As appellant notes, "where the cost of repairs exceeds the diminution in value, ... the cost of repairs is *not* the measure of damages." *Freeman v. Maple Point, Inc.,* 393 Pa.Super. 427, 574 A.2d 684, 688 (1990) (emphasis in original). Instead, appellant sets forth as the proper method:

> [t]he measure of damages in cases where a homeowner sues for defective construction is the difference between the market value of the house as constructed and the market value that the house would have had if constructed as promised, with the qualification that if it is reasonably practical to cure the defects in construction by repair, and if the cost of repairs does not exceed the difference in market value, the measure of damages is the cost of repair.

*Id.,* 393 Pa.Superior Ct. at 430, 574 A.2d at 686.

In the present case, both the plaintiffs and Ryan Homes presented evidence on the cost to cure the mine water problem at the house. Plaintiff's expert estimated the cost at $32,500.00, while the Ryan Homes expert proposed a figure of $7,000.00. The trial court found the proposal offered by the plaintiff's expert to be the best solution from the evidence presented. The next step was then to compare the cost to repair with the diminution in market value as a

result of the water problem. Plaintiff's expert opined that the diminution in value caused by the water problem left the house with a market value of $40,000.00. The difference in value therefore produced the same figure as the cost to repair and so the trial court awarded that figure as damages. Ryan Homes now complains that this is not a genuine comparison because all that plaintiffs' expert did was to deduct cost to repair from current market value to arrive at the diminished market value. Ryan contends that the law requires a genuine comparison between cost to repair and diminution in market value. In support of its genuine comparison approach, Ryan notes that it presented independent expert evidence of the property's diminished market value. As Ryan sets forth in its brief to this court, "the diminution in value, calculated independently of the cost to repair, is $7,000.00. Interestingly, that is the precise figure that Ryan offered as the cost to repair the problem. Regardless of the rhetoric attached to the method of arriving at the various figures, the trial court was obviously presented with conflicting expert testimony as to cost to repair and diminution in market value. As the trier of fact in this case, the trial court was free to believe whatever expert opinion it found to be most credible in light of the facts. As the trial court has concluded that the cost to repair is $32,500.00 and the diminution in market value is also $32,500.00, then under the mandates of *Freeman, supra,* the trial court was correct in awarding that amount as damages for breach of the warranty of habitability.

The third issue raised by appellants concerns the propriety of the award of attorney's fees and litigation expenses. Clearly, the trial court awarded these damages pursuant to the count in the complaint alleging fraud. The trial court specifically notes that it was awarding legal fees and expenses on the basis of fraud in that the defendants made misleading misrepresentations to the plaintiffs which they in turn relied upon to their detriment. However, it is not necessary that we consider whether such damages are recoverable under a cause of action based upon fraud. For,

as Ryan Homes notes in their supplemental brief to this court, should this court conclude that plaintiffs' cause of action accrued any time after February 18, 1983, then the count based upon fraud would be subject to the new two-year statute of limitations. *See* 42 Pa.C.S.A. section 5524(7). As we have already concluded that the plaintiffs' cause of action accrued in July 1985, the claim for fraud is necessarily time barred as the complaint was not filed until September 9, 1987, more than two years after the accrual of the action. As the federal court has noted in discussing Pennsylvania's new statute of limitations for fraud, any claim for fraud brought after February 18, 1983, is specifically governed by the language of section 5524(7) which expressly applies a two year limitations period to fraud claims. *See A.J. Cunningham Packing Corp. v. Congress Financial Corp.*, 792 F.2d 330 (3d Cir.1986). Because we hold that appellees' claim for fraud is time barred we reverse that part of trial court order awarding plaintiffs' $17,288.92 in attorney's fees and any litigation expenses relative to the fraud claim.[3]

The final issues raised for this court's consideration concern the extent of liability for the damages as between Ryan Homes and Pleasant Valley Land Company. Simply stated, each is arguing that the other is liable for the full extent of the damages. The trial court concluded that the two parties were jointly and severally liable for the full amount of the damages. Because neither party has offered any grounds for error regarding such a ruling, and because we can find no error on the part of the trial court, we will not disturb that part of the trial court's order.

That part of the trial court order awarding damages to plaintiffs in the amount of $32,500.00 as costs to repair the house is affirmed. The part of the trial court's order awarding damages to the plaintiffs in the amount of $17,288.92 for other pecuniary loss related to the fraud claim is

---

3. Appellees were awarded expert witness fees of $2,150.00 as a part of the grant of relief on the fraud claim. Our vacating of this award is without prejudice to any relief appellees may have for costs under the Rules of Civil Procedure.

reversed. Finally, the part of the trial court order holding both Ryan Homes and Pleasant Valley Land Company jointly and severally liable for the damages is affirmed.

Order affirmed in part and reversed in part. Jurisdiction relinquished.