[No. 24953-7-II. Division Two. November 9, 2000.]

HOLBROOK, INC., *Appellant*, v. LINK-BELT CONSTRUCTION EQUIPMENT COMPANY, ET AL., *Respondents*.

*Peter T. Petrich* (of *Davies Pearson, P.C.*), for appellant.

*Jerret E. Sale* and *Elizabeth C. Kim* (of *Bullivant Houser Bailey, P.C.*); and *John A. Knox* and *Margaret A. Sundberg* (of *Williams, Kastner & Gibbs, P.L.L.C.*), for respondents.

HUNT, J. — Holbrook, Inc. (Holbrook) appeals the summary judgment dismissal of its product liability lawsuit to recover on warranties for a defective log loader from Link-Belt Construction Equipment Company and Isuzu Diesel of North America, Inc. Holbrook argues the trial court erred in ruling that statutes of limitations barred its claims. We affirm, holding that: (1) Holbrook's warranty claims do not fall within the "future performance" exception of the statute of limitations; (2) the warranty statute of limitations was not tolled by Link-Belt's and Isuzu's repair efforts; and (3) Holbrook's product liability claim was also time-barred because Holbrook knew of the defect more than three years before filing suit.

## FACTS

Holbrook is a logging company. In August 1988, Holbrook entered into a "Flex Lease" agreement with Howard-Cooper Corporation, a Link-Belt distributor, for the purchase of a Link-Belt hydraulic log loader. The log loader was constructed from a converted excavator and powered by an Isuzu engine. Holbrook's president, Jerry Holbrook, negotiated the agreement with Howard-Cooper sales manager Cecil White. Under the "Flex Lease" agreement, Holbrook could rent the log loader for six months and then either purchase or return it. The $266,574 purchase price included the cost of extended Link-Belt and Isuzu warranties.

Link-Belt issued its standard warranty when it delivered the log loader on September 9, 1988. The warranty provided:

> [Link-Belt] warrants all products manufactured by it to be free from defects in material and manufacture *at the time of shipment* for twelve (12) months from date of shipment or 1500 hours of operation, whichever shall occur first. [Link-Belt] will furnish without charge, f.o.b. its factory, replacements for such [of] the parts as [Link-Belt] finds to have been defective *at the time of shipment,* or at [Link-Belt's] option, will make or authorize repairs to such parts . . . .

(Emphasis added.) Link-Belt's extended warranty for powertrain components covered "a time period of thirty[-]six (36) months after initial delivery of the machine or 5000 operating hours, whichever occur[red] first."

Isuzu's standard engine warranty covered parts and labor for 12 months or 1,800 hours of operation under the following conditions:

> [Isuzu's] products and parts, *when shipped,* will meet all applicable specifications and will be free from defects in material and workmanship. . . .
>
> *All claims for defective products or parts under this warranty must be made in writing immediately upon discovery* and, in any event, but not to exceed twelve (12) months after delivery . . . .

The repair of defective engine parts qualifying under this warranty will be performed by an authorized service outlet, using new parts, *within a reasonable time following the delivery of the engine* to the service outlet's place of business.

(Emphasis added.) The extended Isuzu warranty, labeled an "Extended Service Plan," required Isuzu to "pay 100% of parts and labor to repair or replace" defective engine components for three years or 5,000 hours of operation, whichever occurred first.

The log loader was plagued by mechanical problems from the beginning. A Howard-Cooper mechanic had to fix "a fuel problem . . . [or] some filter" just to off-load the log loader from the delivery truck. And in the three or four months following delivery:

The hydraulic pressures were real sporadic and . . . would spike and blow hoses. The boom control was extremely radical. It would shake. The pressures would get so high that it would shake the cab and [you] couldn't control the operation of the machine.

In November 1988, frustrated by the log loader's performance, Jerry Holbrook contacted White to ask about returning the log loader to Link-Belt and canceling the flex lease. White convinced Holbrook to keep the log loader, "insisting that Link-Belt and Howard-Cooper could fix" it. But according to Jerry Holbrook, "for far more than two years, Howard-Cooper, Link-Belt, Isuzu, and their authorized repair companies . . . made repeated attempts to replace and repair parts on both the log loader and the engine" with little success. From 1989 through 1992, Howard-Cooper and Link-Belt represented that they could fix the log loader.

In April or May 1990, a Holbrook employee was operating the log loader when the cab broke apart from the rest of the machine. Jerry Holbrook examined the log loader and its detached cab both "on the job and at Howard-Cooper"; he suspected that the "the weld around the riser portion wasn't properly adhered, wasn't welded properly."

Sometime before 1992, Jerry Holbrook consulted an attorney regarding repair problems Holbrook was experiencing with Howard-Cooper and Link-Belt. Link-Belt continued to approve warranty claims for repairs by Howard-Cooper and its successor as late as February 1993. In May 1993, a Howard-Cooper mechanic confirmed Holbrook's earlier suspicion that the cab had not been properly welded to the body of the log loader.

In December 1993, Holbrook sued Link-Belt and Isuzu, later adding Howard-Cooper as a defendant.[1] Holbrook claimed negligent manufacture, breach of express and implied warranties, and violation of the Washington Product Liability Act (WPLA), chapter 7.72 RCW. Jerry Holbrook later testified in his deposition that he did not fault Isuzu for the cab's separation.[2]

The trial court granted Link-Belt and Isuzu summary judgment and dismissed Holbrook's case, ruling that the statutes of limitations had run on Holbrook's breach of warranty and WPLA causes of action.[3]

## ANALYSIS

### I. Breach of Warranty Claims - Timeliness

The statute of limitations for a breach of warranty claim is "four years after the cause of action has accrued." RCW 62A.2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." RCW 62A.2-725(2).

A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future

---

[1] But the trial court dismissed Howard-Cooper from this action because Holbrook had not timely joined Howard-Cooper as a defendant. See 11 U.S.C. § 108.

[2] At oral argument, Holbrook's counsel similarly conceded that the claims arising from the defective weld did not apply to Isuzu.

[3] The trial court apparently concluded that the WPLA preempted the negligent manufacturing cause of action. See RCW 7.72.010(4). Holbrook does not mention this cause of action on appeal.

performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

RCW 62A.2-725(2). In other words, the four-year limitations period normally begins to run upon delivery of the goods. But if goods are sold with a warranty of future performance, the limitations period runs from the date on which the defect is or should have been discovered.[4]

## A. EXPRESS WARRANTIES OF FUTURE PERFORMANCE

Holbrook contends: (1) The log loader's extended warranties "explicitly extend to future performance";[5] (2) therefore, the time for filing this action did *not* commence on the log loader's delivery date, some five years and three months before filing the complaint; (3) rather, it began to run "when the seller notified Holbrook that it considered the warranties expired and that it would not undertake any further attempts to repair."

No Washington appellate court has considered warranties under RCW 62A.2-725 similar to those issued by Link-Belt and Isuzu.[6]

> Presumably . . . a [future performance warranty] case would be one in which the seller gave a "lifetime guarantee" or one in which seller, for example, expressly warranted that an automobile would last for 24,000 miles or four years whichever

---

[4] Link-Belt and Isuzu contend that, even if their warranties could be construed as covering future performance, Holbrook discovered, or should have discovered, any breach contemporaneously with delivery. They cite Jerry Holbrook's declaration that the log loader was "plagued with problems from the time it was delivered in September of 1988," and his deposition testimony that, in November 1988, he considered the log loader to be a "lemon."

[5] Holbrook seems to recognize that implied warranties, by their very nature, never "explicitly extend[s] to future performance." *W. Recreational Vehicles, Inc. v. Swift Adhesives, Inc.*, 23 F.3d 1547, 1550 (9th Cir. 1994) (quotation marks omitted).

[6] Some commentators have identified a split of authority as to the effect of "commitment[s] to repair or replace for a stated period of time." 5 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2-725-129, at 292-93 (3d ed. 1994); David B. Harrison, Annotation, *What Constitutes Warranty Explicitly Extending to "Future Performance" for Purposes of UCC § 2-725(2)*, 93 A.L.R.3D 690, 696-98 (1979).

occurred first. If the automobile failed in the 20,000th mile and after three years of driving, the buyer (if she had no notice or knowledge of the defect prior to the failure) would have four years from that date to commence her suit notwithstanding that her suit would then be brought seven years after the sale had occurred.

1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 11-9, at 608-09 (4th ed. 1995) (footnote omitted).

Holbrook relies primarily on *Wienberg v. Independence Lincoln-Mercury, Inc.*, 948 S.W.2d 685 (Mo. Ct. App. 1997), and *Anderson v. Crestliner, Inc.*, 564 N.W.2d 218 (Minn. Ct. App. 1997). In *Wienberg*, an automobile had a "bumper to bumper limited warranty" for 34 months or 34,000 miles, whichever occurred first. 948 S.W.2d at 687. The warranty provided that the manufacturer's

> authorized dealers will repair, replace, or adjust all parts (except tires) that are found to be defective in factory-supplied materials and workmanship. The defects must occur under normal use of the car *during the warranty coverage period.*

*Wienberg*, 948 S.W.2d at 687 (emphasis added). The Missouri Court of Appeals held that the warranty was a future performance warranty because the manufacturer had promised to "repair or replace any defects in the vehicle . . . for a specified period of time . . . ." *Wienberg*, 948 S.W.2d at 689-90.

The Link-Belt and Isuzu warranties, however, differ from the warranty in *Wienberg*. The *Wienberg* warranty contained a commitment to repair, to replace, or to adjust defects that might occur during a specified future period. The Link-Belt and Isuzu warranties, on the other hand, contained commitments to repair or to replace, during a limited time period, defects *already present at the time of shipment.*

Holbrook's reliance on *Anderson* is similarly misplaced. The warranty in *Anderson* provided that the hull and deck structure of a boat would "be free from any defects in material and workmanship for a period of five years," 564

N.W.2d at 221, and that the retailer would repair or replace the defects, 564 N.W.2d at 220. In characterizing this warranty as one of future performance, the *Anderson* court differentiated between "repair or replacement commitment[s]" and warranties of future performance:

> "[T]he key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a *remedy* if the product becomes defective, while a warranty for future performance *guarantees the performance* of the product itself for a stated period of time. In the former case, the buyer is relying upon the warranty merely as a method by which a defective product can be remedied which has no effect upon his ability to discover a breach. In the latter instance, the buyer is relying upon the warranty as a guarantee of future performance and therefore has no opportunity to discover the breach until the future performance has been tested."

*Anderson*, 564 N.W.2d at 222 (quoting *Ontario Hydro v. Zallea Sys.*, 569 F. Supp. 1261, 1266 (D. Del. 1983)).

The *Anderson* court further contrasted this future performance warranty with the warranty in *Crouch v. Gen. Elec. Co.*, 699 F. Supp. 585, 593 (S.D. Miss. 1988):

> "The Contractor warrants that each of the . . . [helicopter] engines under contract . . . will, at the *time delivery* [sic] be free from defects in material and workmanship.
>
> ". . . .
>
> "The warranty on each of the . . . engines shall cease three (3) years from the date the Government accepts the first engine . . . or upon expiration of five hundred (500) total engine hours . . . .

(Emphasis added.) Following this provision was "a description of [the manufacturer's] obligations in the event of a covered defect which [were] limited to the repair and replacement of defective parts." *Crouch*, 699 F. Supp. at 594. The *Crouch* court held that this language did *not* guarantee future performance but, rather, "simply warrant[ed] the condition of the goods at the *time of delivery*." *Crouch*, 699 F. Supp. at 594. In so holding, the court noted:

> The "overwhelming majority" of courts have interpreted

future performance exceptions . . . very strictly. To come within the future performance exception, a warranty must *explicitly promise or guarantee future performance of the goods*; it must be clear, unambiguous and unequivocal.

*Crouch*, 699 F. Supp. at 594 (citations omitted) (emphasis added); *accord Cent. Wash. Refrigeration, Inc. v. Barbee*, 81 Wn. App. 212, 225, 913 P.2d 836 (1996) (no warranty of future performance where manufacturer's representations did not refer to a specific future time; rather, they were equivalent to a warranty that the equipment would perform at the time of delivery as specified), *rev'd on other grounds*, 133 Wn.2d 509, 946 P.2d 760 (1997).

The Link-Belt and Isuzu warranties, which focus on defects present only *at the time of shipment*, are indistinguishable in substance from the warranty in *Crouch* and other cases involving similar warranties not "explicitly extend[ing] to future performance of the goods . . . ." RCW 62A.2-725(2).[7]

Underlining the warranty to make needed repairs is the assumption that the goods may fall into disrepair or otherwise malfunction. No warranty that the goods will not, is to be inferred from the warranty to make needed repairs.

*Owens v. Patent Scaffolding Co.*, 77 Misc. 2d 992, 354 N.Y.S.2d 778, 785 (1974), *rev'd on other grounds*, 50 A.D.2d 866, 376 N.Y.S.2d 948 (1975). The trial court, here, did not err in ruling the future performance exception of RCW 62A.2-725(2) inapplicable.[8]

---

[7] *See, e.g., Neb. Popcorn, Inc. v. Wing*, 258 Neb. 60, 602 N.W.2d 18, 21, 25 (1999) ("[Manufacturer] warrants . . . that it will repair or replace . . . any load cell supplied with a motor truck scale which . . . is defective in material or workmanship for a period of two (2) years from the date of original shipment."); *Centennial Ins. Co. v. Gen. Elec. Co.*, 74 Mich. App. 169, 253 N.W.2d 696, 697 n.1 (1977) ("If it appears within one year from the date of shipment . . . that the equipment . . . does not meet the warranties," the manufacturer will repair or replace defective parts. (Emphasis omitted.)).

[8] Moreover, when, as here, the breach of warranty is discovered upon the delivery of the goods, or shortly thereafter, "it is immaterial whether it is a warranty which relates to future performance or not, for in either case, suit brought more than four years after delivery is barred by the statute of limitations." 5 ANDERSON, *supra* note 6, at 284. *See, e.g., Ranker v. Skyline Corp.*, 342 Pa.

## B. The Repair Doctrine - Tolling the Statute of Limitations

In the alternative, Holbrook argues that we should apply the "repair doctrine" to toll the four-year statute of limitations based on the repair attempts of Howard-Cooper, Link-Belt, and Isuzu. If this were the case, the statute of limitations would be tolled only if (1) "evidence reveals that repairs were attempted"; (2) "representations were made that the repairs would cure the defects"; and (3) "the plaintiff relied upon such representations." *Amodeo v. Ryan Homes, Inc.*, 407 Pa. Super. 448, 595 A.2d 1232, 1237 (1991).

But the repair doctrine has been endorsed in few jurisdictions.[9] *See* 5 Ronald A. Anderson, Anderson on the Uniform Commercial Code § 2-725-131, at 295-96 (3d ed. 1994); 67A Am. Jur. 2D *Sales* § 947, at 350 (1985); Gary D. Spivey, Annotation, *Promises or Attempts by Seller to Repair Goods as Tolling Statute of Limitations for Breach of Warranty*, 68 A.L.R.3D 1277, 1280 (1976). The apparent reason that the majority of jurisdictions[10] reject the repair doctrine is that granting exceptions to specific statutes of limitation is the prerogative of the legislature. *See Binkley Co. v. Teledyne Mid-Am. Corp.*, 333 F. Supp. 1183, 1187 (E.D. Mo. 1971), *aff'd*, 460 F.2d 276 (8th Cir. 1972). Moreover, the repair

Super. 510, 493 A.2d 706, 709 (1985) (defect discovered two weeks after delivery); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 740, 743 (2d Cir. 1979) (defects in new computer system discovered "at the first computer run"); *Gemini Typographers, Inc. v. Mergenthaler Linotype Co.*, 48 A.D.2d 637, 368 N.Y.S.2d 210, 211, 212 (1975) ("Typographers experienced difficulties in use of the machinery almost from the moment of installation . . . .").

[9] *E.g., Keller v. Volkswagen of Am., Inc.*, 733 A.2d 642, 646 (Pa. Super. Ct. 1999); *Aced v. Hobbs-Sesack Plumbing Co.*, 55 Cal. 2d 573, 360 P.2d 897, 904, 12 Cal. Rptr. 257 (1961).

[10] *E.g., Triangle Underwriters, Inc.*, 604 F.2d at 743 (applying New York law); *Ontario Hydro v. Zallea Sys.*, 569 F. Supp. 1261, 1272 (D. Del. 1983) (applying Delaware law); *Pako Corp. v. Thomas*, 855 S.W.2d 215, 219 (Tex. Ct. App. 1993); *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 699 (Ind. Ct. App. 1987); *Poppenheimer v. Bluff City Motor Homes*, 658 S.W.2d 106, 111-12 (Tenn. Ct. App. 1983); *K/F Dev. & Inv. Corp. v. Williamson Crane & Dozer Corp.*, 367 So. 2d 1078, 1079-80 (Fla. Dist. Ct. App. 1979); *E.L. Farmer Constr. Co. v. Hartford Accident & Indem. Co.*, 114 Ariz. 210, 560 P.2d 65, 67 (Ct. App. 1976); *Tomes v. Chrysler Corp.*, 60 Ill. App. 3d 707, 377 N.E.2d 224, 227 (1978); *Zahler v. Star Steel Supply Co.*, 50 Mich. App. 386, 213 N.W.2d 269, 270 (1973).

doctrine conflicts with the purpose for applying the four-year limitations period to breach of warranty claims—to permit commercial sellers to discard their warranty records at the end of the "normal commercial record keeping period." UNIF. COMMERCIAL CODE § 2-725, 1B U.L.A. 588 (1989); *see also Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 340 (Wyo. 1986).

Holbrook contends that Washington adopted the repair doctrine in *Daughtry v. Jet Aeration Co.*, 18 Wn. App. 155, 566 P.2d 1267 (1977), *rev'd*, 91 Wn.2d 704, 592 P.2d 631 (1979). Citing a pre-U.C.C. North Carolina case,[11] Division One of the Washington Court of Appeals held that the RCW 62A.2-725 statute of limitations was tolled while the seller of a defective sewage treatment system "was attempting to remedy its defective performance." *Daughtry*, 18 Wn. App. at 157. The Washington Supreme Court reversed and remanded to the trial court for entry of findings of fact regarding "the period of express [future performance] warranty, whether the breach occurred during that period, and whether the breach was reasonably discovered sufficiently along in the period so as to permit filing of the suit when Daughtry did so."[12] *Daughtry*, 91 Wn.2d at 708. But the Supreme Court made no mention of the repair doctrine. Had the Supreme Court accepted Division One's application of the repair doctrine, there would have been no need for a remand to determine the period of a future performance warranty because application of the repair doctrine would have extended the four-year limitations period without regard to the type of warranty at issue.

■ ■ We agree with Isuzu that the repair doctrine, which "is merely a particularized form of estoppel," *Ranker v. Skyline Corp.*, 342 Pa. Super. 510, 493 A.2d 706, 709

---

[11] *Styron v. Loman-Garrett Supply Co.*, 6 N.C. App. 675, 171 S.E.2d 41 (1969).

[12] The Washington Supreme Court observed that the sewage treatment system was purchased "more than 4 years prior to filing of the action . . . [and] the cause of action could *only* survive if it accrued subsequent to delivery of the system, from breach of explicit warranty *in conformity with the exception indicated in subsection (2)*" of RCW 62A.2-725. *Daughtry*, 91 Wn.2d at 708 (emphasis added).

(1985), is inconsistent with the estoppel principle in *Del Guzzi Constr. Co. v. Global N.W. Ltd.*, 105 Wn.2d 878, 885, 719 P.2d 120 (1986):

> Estoppel will preclude a defendant from asserting the statute of limitation when his actions have *fraudulently* or *inequitably* invited a plaintiff to delay commencing suit until the applicable statute of limitation has expired.[13]

In contrast, the repair doctrine would toll the statute merely upon (1) attempted repairs, (2) good faith representations that the repairs will cure the defects, and (3) reliance by the plaintiff on the representations. *Amodeo*, 595 A.2d at 1237. Consequently, we reject the repair doctrine. *See Ranker*, 493 A.2d at 710 ("Any other rule would discourage attempts to correct defects in products sold pursuant to warranty."). As Link-Belt suggests,

> Any repairs voluntarily undertaken by a product seller would be to the seller's detriment as each repair would start anew the running of the statute of limitations, and there would be little incentive for sellers to work with purchasers to repair equipment.

Moreover, Holbrook's repair argument also fails under equitable estoppel theory.

Jerry Holbrook maintains in his declaration: "When [he] was in the process of purchasing the log loader, [he] observed representatives from Link-Belt on site at Howard-Cooper and at [the company that converts excavators into log loaders]"; "Link-Belt's representatives were . . . on site when the [log loader] was delivered"; he did not return the log loader after six months because Cecil White had insisted that "Link-Belt and Howard-Cooper could fix" it; he

---

[13] As the Supreme Court of Iowa recognized,

> The repair of defective goods does not in itself rise to the level of deception. *Neither do we believe that repairs accompanied by assertions that they will cure the defect generally amount to false misrepresentations.* To be deceptive or fraudulent there must be some evidence that such repairs and assertions were not only made to conceal the true condition of the product, but also with the intent to mislead the injured party into the trap of the time bar.

*Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 580 (Iowa 1990) (emphasis added).

(Holbrook) "received similar representations from . . . Howard-Cooper, and Link-Belt through 1989, 1990, 1991, and 1992"; "for far more than two years, Howard-Cooper, Link-Belt, Isuzu, and their authorized repair companies have made repeated attempts to replace and repair parts on both the log loader and the engine"; and "Link-Belt continued to approve certain warranty claims for repairs by Howard-Cooper and its successor . . . as late as February, 1993." Holbrook also points to Cecil White's November 1988 note memorializing a conversation in which Holbrook inquired about returning the log loader: "I stalled [Holbrook,] asking why return [it] & let's see if [we] can fix [the] prob[lem]."

But none of Jerry Holbrook's allegations suggest that either Link-Belt or Isuzu intended to mislead Holbrook so that Holbrook would be lulled into inaction, unable to bring a timely lawsuit. Rather, Holbrook's allegations suggest that Link-Belt and Isuzu attempted repairs simply to remedy the problems with the log loader. Moreover, Holbrook identifies no fallacious representations by Isuzu or Link-Belt.[14] Thus, Holbrook's repair argument fails under equitable estoppel theory.

In short, Holbrook's repair arguments do not revive its untimely warranty claims. We therefore hold that the trial court did not err in granting summary judgment on those claims.

---

[14] And to the extent that Holbrook attributes Cecil White's representations and actions to Link-Belt, Holbrook has not proffered any evidence to show that White acted in an agency capacity. The "Distributor Agreement" between Howard-Cooper and Link-Belt provided:

Nothing in this Agreement shall constitute [Howard-Cooper] an agent of [Link-Belt]. [Howard-Cooper] is an independent contractor . . . . [Howard-Cooper] shall not impose or create any obligation or responsibility, express or implied, or make any promises, representations, or warranties on behalf of [Link-Belt].

The closest Holbrook comes to establishing an agency relationship is the deposition testimony of Jerry Holbrook that a Link-Belt representative told him that Howard-Cooper was *either* its agent, dealer, *or* distributor. Jerry Holbrook was unable to recall which description the Link-Belt representative used.

## II. Timeliness of the Products Liability Claim

A product liability claim must be brought within "three years from the time the claimant discovered or in the exercise of due diligence should have discovered the harm and its cause." RCW 7.72.060(3). In April or May 1990, when the log loader's cab separated from the chassis, Holbrook correctly surmised that the cause was a defective weld. But he failed to file suit until December 1993.

■ That Holbrook did not confirm this belief until May 1993 did not toll the running of the three-year limitations period. Holbrook cites no authority to support his proposition that a claimant discovers the cause of the harm only when he or she is "absolutely certain" of the cause. And we decline Holbrook's implicit invitation to adopt such a rule judicially, because to do so would negate the statute's constructive discovery component, which the Legislature included. *See* RCW 7.72.060(3).

We hold that the trial court did not err in granting summary judgment on Holbrook's WPLA claim. Affirmed.

Armstrong, C.J., and Bridgewater, J., concur.