745 A.2d 606

**Ronald E. CROUSE, Sr. and Aliquippa Forge, Inc., Appellants,**

v.

**CYCLOPS INDUSTRIES and Combined Cytemp Specialty Steel Division of Cyclops Industries, Appellees.**

Supreme Court of Pennsylvania.

Argued March 9, 1999.

Decided Jan. 28, 2000,

Linda C. Plum, McKeesport, Christopher M. DeVito, for Ronald Crouse, Sr. and Aliquippa Forge, Inc.

Brian T. Himmel, Paul H. Titus, Titus & McConomy, Pittsburgh, for Cyclops Industries and Combined Cytemp Specialty Steel.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NIGRO, Justice.

The issue presently before this Court is whether the Superior Court erred in finding that appellants' complaint was untimely filed. At the conclusion of a three-day trial, the jury returned a verdict for appellants on their claim for promissory estoppel which the Superior Court reversed as barred by the statute of limitations. For the reasons stated below we find that the statute of limitations on an action sounding in promissory estoppel is four years and that, under the facts of this case, the question of when the appellants knew or should have known of a breach by the appellees is a question of fact which should have been submitted to the jury. We therefore affirm the Superior Court as to the applicable statute of limitations but reverse and remand to the trial court for a new trial on the singular issue of promissory estoppel, including a jury determination as to when the statute of limitations period began to run.

A careful review of the record reveals the following.[1] In 1986, appellant Ronald Crouse (Crouse) expressed an interest in purchasing a dormant steel forge in Aliquippa Pennsylvania, Aliquippa Forge, Inc. (Aliquippa), owned by appellees Cyclops Industries and Combined Cytemp Specialty Steel Division of Cyclops Industries (collectively, Cyclops). Following negotia-

1. Trial Court Senior Judge Jiuliante, on loan to Allegheny County from Erie County, sat by designation on this case, but moved to the Commonwealth Court as Senior Judge without writing an opinion in this matter.

tions, Crouse and Cyclops agreed to a price, subject to Crouse's ability to secure financing within a six-month window. During the buy-sell negotiations, Crouse and Cyclops also entertained the idea that Crouse would fill some of Cyclops's forging needs, but came to no firm understanding. While in search of financing, Crouse included in his business plan [2] the possibility of doing business with Cyclops but found that potential lenders required a firmer commitment from Cyclops that it would outsource some of its steel conversion work to Aliquippa. Crouse told then-Cyclops president, John Buser (Buser) what the financiers required and Buser responded with a commitment letter. In the letter to Crouse dated January 12, 1987 Buser wrote:

\* \* \* \*

[Cyclops] is willing to commit to have Aliquippa Forge Inc. forge an average of 3 to 4 hundred thousand pounds per month on the Aliquippa facility provided price and delivery are comparative and the quality meets our requirements. Please be aware that we can not, and do not, guarantee a uniform flow in either quantity or type of forging to be done.

We look forward to working with you in developing a mutually beneficial business relationship and hope to be sending you our first lot of material in the near future.

N.T., January 30, 1996, at 51.

With this letter, Crouse obtained the necessary financing and entered into an agreement of sale with Cyclops for the land and the buildings and a separate agreement for the equipment and machinery.[3] These agreements of sale for the property did not mention the steel forging work referenced in Buser's letter. Furthermore, each of the agreements provided:

**2.** A letter from Cyclops to Crouse written on October 31, 1986 concerning the steel conversion work was used by Crouse in drafting his business plan.

**3.** The total price, including $1.00 for the equipment and machinery was $400,001.00.

\* \* \* \*

This Agreement and the exhibits attached hereto represent the entire understanding of the parties and supersede all prior written or oral agreements or understandings between the parties with respect to the transaction contemplated hereby. This agreement may be amended only in writing signed by both parties hereto.

N.T., January 30, 1996, at 60.

Aliquippa began operation in June 1987. Beginning in July 1987, Cyclops ordered and Aliquippa executed 334,871 pounds of steel conversion work.[4] On August 3, 1987, Crouse received a letter from Roger A. Hill, a quality engineer for Cyclops, informing Crouse that Aliquippa had been placed on Cyclops's "approved vendor list as a conversion source for Press Work." Exhibit 15.

Under pressure from his lenders, Crouse met with Mike Sullivan, Vice President of Operations at Cyclops's Cytemp Division, on September 23, 1987 to discuss the low volume of conversion work from Cyclops to date. Crouse memorialized the meeting in a letter to Sullivan on November 24, 1987, in which Crouse recapped Sullivan's remarks that Aliquippa should have been considered for outsourced conversion work which may have been going to other companies and that Aliquippa would now be given first priority on such work. Further, Crouse's confirming letter reiterated his inquiry as to whether there were any problems with Aliquippa's performance, any drop in Cyclops's requirements or any reason at all why, in the course of the first six months of operation, the quantities weren't closer to what Buser's commitment letter specified. In addition, Crouse reminded Sullivan that, pursuant to an earlier discussion between Crouse, Sullivan and Buser, and in an effort to develop the mutually beneficial business relationship referenced in the commitment letter, Crouse had seen to it that Aliquippa's sister company, Ameri-

4. The first purchase order was placed in July 1987; six more invoices were received between September 3 and September 18, 1987.

can Specialty Metals, (American Specialty) was purchasing nearly all its tool steel from Cyclops.[5]

Sullivan did not reply to this letter and so Crouse followed up with numerous phone calls. When he called over the next several months, Crouse discovered that there had been shifts in personnel, different authorities were in charge and new people were handling the placement of outsourced conversion.[6] Finally, on August 31, 1988, Crouse arranged to meet with Cyclops again. In his follow-up letter of September 1, 1988, to Alan Echko, Cyclops's Vice President and Controller at Cytemp and Mike Sullivan, now Vice President of Operations, Planning and Engineering, Crouse recapped the August 31, 1988 meeting in which Sullivan suggested that Aliquippa could forge Cytemp's UT718 20–inch round 8500 pound ingot in the future. Furthermore, Crouse memorialized his own offer to hold his prices on Cyclops's specific forging needs to the end of 1988 and to discount each invoice by 50%.[7] Again, there was no reply to this letter.

Aliquippa ceased operations in February 1991, never having received another order from Cyclops, yet never having been told that the agreement was terminated, or that orders would not be forthcoming. On September 5, 1992, Crouse filed suit in the Court of Common Pleas of Allegheny County against Cyclops for breach of contract, fraud and promissory estoppel. The fraud count was dismissed and the jury returned a verdict for Crouse on the count of promissory estoppel only, in the amount of $210,000. On appeal, the Superior Court reversed, finding that Crouse's complaint was barred as untimely filed beyond the expiration of the four-year statute of limitations.

We granted allocatur to determine first, whether an action sounding in promissory estoppel is governed by a four-year

5. At the time of this letter, Cyclops had placed approximately $70,000 worth of conversion work with Aliquippa while Crouse had purchased approximately $300,000 worth of tool steel from Cyclops.

6. Among the changes in personnel was John Buser's departure in August 1987.

7. The discount was to be applied to what American Specialty owed Cyclops for tool steel. As Cyclops never placed an order under these terms, Crouse eventually paid cash in full for the tool steel.

statute of limitations or a six-year statute of limitations and, second, whether, pursuant to the proper period, Crouse's action was timely filed.

 Crouse claims that promissory estoppel is not governed by the four-year limitations period articulated in 42 Pa.C.S. § 5525 because, while this section enumerates several contract actions under its aegis, promissory estoppel is not among them.[8] Instead, Crouse argues, promissory estoppel is an equitable doctrine and that, as such, it is properly governed by the "catch-all" statute of limitations under § 5527, which states:

Six Year Limitation

Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years.

42 Pa.C.S. § 5527.

 Because an action in promissory estoppel is not specifically provided for under any of the statute of limitations provisions in § 5525 or elsewhere, we must examine the nature of the doctrine to determine which statutory subsection applies. Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment. RESTATE-

8. The contract actions governed by the four-year statute of limitations pursuant to 42 Pa.C.S. § 5525 are enumerated therein as follows:

(3) An action upon an express contract not founded upon an instrument in writing.

(4) An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter.

(8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph 7 [dealing with negotiable instruments], under seal or otherwise, except an action subject to another limitation in this subchapter.

42 Pa.C.S. § 5525.

MENT (SECOND) CONTRACTS § 90; *see, e.g., Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa.Super.1997). In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. *Id.* As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute. Thus, as promissory estoppel makes otherwise unenforceable agreements binding, the doctrine sounds in contract law and we hold that, like other contract actions, the statute of limitations for a cause of action in promissory estoppel is governed by § 5525. Therefore, the Superior Court properly held that the limitations period where an agreement is enforceable under the doctrine of promissory estoppel is four years.

However, our inquiry does not end here. Applying the four-year statute of limitations, Cyclops claims that Crouse's September 5, 1992 complaint was not timely filed. Specifically, Cyclops argues that, by the end of 1987, Crouse knew or should have known of its alleged breach because it had failed to provide the volume of work set forth in the commitment letter. If that is the case, then the statute of limitations would have begun to run in late 1987 and Crouse would have had to file his action by the end of 1991 rather than September of 1992.

As a general rule, it is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to initiate suit within the prescribed period. *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 324, 608 A.2d 1040, 1042 (1992). Therefore, the statute of limitations begins to run as soon as a right to institute and maintain suit arises. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 84, 468 A.2d 468, 471 (1983). Whether a complaint is timely filed

within the limitations period is a matter of law for the court to determine. *Hayward,* 530 Pa. at 325, 608 A.2d at 1043. However, in some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of diligence, reasonably discover that he has been injured. In such cases the statute of limitations does not begin to run at the instant the right to institute suit attaches, rather the discovery rule applies. The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct. *Pearce v. Salvation Army,* 449 Pa.Super. 654, 657–59, 674 A.2d 1123, 1125 (1996). Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue "best determined by the collective judgment, wisdom and experience of jurors." *White v. Owens–Corning Fiberglas Corp.,* 447 Pa.Super. 5, 22, 668 A.2d 136, 144 (1995) (quoting *Petri v. Smith,* 307 Pa.Super. 261, 271–72, 453 A.2d 342, 347 (1982)., *appeal denied, White v. Owen–Corning,* 546 Pa. 648, 683 A.2d 885 (1996). Thus, once the running of the statute of limitations is properly tolled, only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law. *Hayward,* 530 Pa. at 325, 608 A.2d at 1043.

▋ In order to determine when the statute should begin to run, the finder of fact focuses on whether the plaintiff was reasonably diligent in discovering his injury. Reasonable diligence is precisely that—a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case. This Court has long held that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. *Deemer v. Weaver,* 324 Pa. 85, 90, 187 A. 215, 217 (1936). Although reasonable diligence is an objective rather than a subjective standard, "[i]t is sufficiently

flexible ... to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 292, 505 A.2d 973, 988 (1985), *appeal denied* (Dec. 18, 1986). A plaintiff's actions must be evaluated, therefore, to determine whether he exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.* In other words, a party is not under an absolute duty to discover the cause of his injury. Instead, he must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case. *Cochran v. GAF Corp.*, 542 Pa. 210, 217, 666 A.2d 245, 249 (1995).

■ Throughout the trial, Cyclops alleged that Crouse knew or should have known, at the latest by the end of 1987, that the promises made in the commitment letter were not being kept. N.T., January 30, 1996, at 88–90; January 31, 1996, at 133, 143; February 1, 1996, at 357. Specifically, Cyclops referenced a letter, written in November 1987 by Crouse to a third party to whom Crouse owed money, explaining that he was behind in payments and citing the forging work from Cyclops, which was anticipated but not forthcoming, as the reason. Crouse countered with testimony and documentation of the ongoing business relationship between Crouse and Cyclops; of his own efforts to generate the promised work in phone calls throughout 1988; of personal assurances from Cyclops executives at the 1988 meeting; of the notification that Aliquippa was on a Cyclops-approved list; of his agreement with Cyclops to hold forging prices until the end of 1988 and to discount their invoices; and of the very nature of the commitment letter anticipating an irregular flow of tonnage. Because of this evidence and the fact that Cyclops never terminated the agreement, Crouse believed that Cyclops intended to fulfill its promises. Thus, Crouse claims, it was not until the end of 1988 that he should reasonably have known that Cyclops was in breach of the agreement.

The trial judge denied Cyclops's motion for a non-suit based on a violation of the statute of limitations. In so doing, the judge said, "That will be denied. Now, that's something [sic] I'm making that decision now so that we can get this case over with, but if this goes up on appeal, I'm not guaranteeing anything whether it's right or wrong, I'll tell you. *It's just a judgment call on my part.*" N.T., February 1, 1996, at 357 (emphasis added). As there was no trial court opinion, this is the sum total of the benefit of the judge's reasoning on the matter before us. It .is nonetheless instructive as it shows that the trial judge himself deemed the suit to have been timely filed. Thus, the Superior Court erroneously determined that the facts were so clear that reasonable minds could not differ as to the commencement of the limitations period and that it could therefore be determined as a matter of law. At least one reasonable mind—that of the trial judge—could and did differ on the run date for the statute of limitations.

On the one hand, Cyclops claimed that Crouse's explanation to his creditor in 1987 bemoaning the fact that he wasn't getting the expected volume of work from Cyclops was an acknowledgement that he should have known the promise was breached. On the other hand, Crouse claimed that that correspondence was merely an attempt to offer momentary extenuating circumstances to the creditor while he worked things out with Cyclops. Moreover, Crouse presented evidence that his ongoing interactions with Cyclops and Cyclops's continued reassurances led him to believe that the delays were part and parcel of the difficulties attending the internal changes at Cyclops and never an attempt to repudiate the commitment letter.

Under these circumstances, where there were factual and credibility determinations to be made regarding Crouse's reasonable diligence in discovering whether Cyclops was in breach of promises relied on, the issue as to when Crouse knew or should have known of the breach should have gone to the jury. It is not part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried. *Samarin v. GAF Corp.*, 391 Pa.Super. 340, 346,

571 A.2d 398, 401, 402 (1989) *appeal denied,* 524 Pa. 629, 574 A.2d 71 (1990). Thus, the trial judge, who was himself uncertain about the propriety of his own judgment call, mistook a factual finding for a legal conclusion and usurped the province of the jury. The credibility of evidence on both sides of the matter of whether Crouse exercised reasonable diligence in determining whether Cyclops intended to honor its promises to Aliquippa—and therefore whether he knew or should have known of the breach before the end of 1988—was a factual determination for the jury. We therefore hold that the Superior Court erred in reweighing the factual finding of the trial judge instead of remanding to the jury the factual issue of when the statute of limitations began to run.

Therefore, for the reasons set forth above, we affirm the Superior Court decision that a four-year statute of limitations applies but we reverse the Superior Court's dismissal of this suit as untimely filed, and remand to the trial court for a new trial consistent with this opinion.

Justice SAYLOR files a concurring and dissenting opinion which is joined by Chief Justice FLAHERTY and Justice CASTILLE.

SAYLOR, Justice, concurring and dissenting.

I join the majority in holding that the four-year statute of limitations should govern claims predicated on the theory of promissory estoppel. However, I agree with the Superior Court that Appellants' claim is barred, as the record establishes that Appellants knew or had reason to know of the asserted breach more than four years prior to the commencement of this action.[1]

Chief Justice FLAHERTY and Justice CASTILLE join this concurring and dissenting opinion.

1. I also question whether the discovery rule should apply to a claim based upon promissory estoppel. Although the discovery rule, which evolved in the tort context, has been applied by Pennsylvania courts in some discrete categories of cases involving contractual or quasi-contractual claims, *see, e.g., Amodeo v. Ryan Homes, Inc.,* 407 Pa.Super.

448, 453–54, 595 A.2d 1232, 1235 (stating that "the discovery rule does apply to cases involving defective construction"), its use has not been adopted on a wholesale basis in this area, and, notably, other jurisdictions are divided as to its applicability. *Compare Morris v. Fauver*, 153 N.J. 80, 707 A.2d 958, 972 (1998)("the rationale for employing the discovery rule in tort- or fraud-type actions ... does not carry over to most contract actions, and therefore, the discovery rule has not been applied in such suits"); *CLL Assoc. Ltd. v. Arrowhead Pacific Corp.*, 174 Wis.2d 604, 497 N.W.2d 115, 117 (1993)("[i]n the context of general contract law, public policy favors the current rule that the contract statute of limitations begins to run at the time of breach"), *with Heron Financial Corp. v. United States Testing Co.*, 926 S.W.2d 329, 332 (Tex.App.1996)("a discovery rule analysis applies to both tort and contract actions alike").