J-A33033-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NANCY NICOLAOU AND NICHOLAS NICOLAOU, | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | |
| v. | : : | |
| JAMES J. MARTIN, M.D., LOUISE A. DILLONSNYDER, CRNP, JEFFREY D. GOULD, M.D., ST. LUKE'S HOSPITAL, ST. LUKE'S HOSPITAL AND HEALTH NETWORK, ST. LUKE'S HOSPITAL UNION STATION MEDICAL SURGICAL CLINIC D/B/A ST. LUKE'S SOUTHSIDE MEDICAL CENTER, ST. LUKE'S ORTHOPEDIC SURGICAL GROUP, AND NAZARETH FAMILY PRACTICE, | : : : : : : : : : : : : : | |
| Appellees | : | No. 1286 EDA 2014 |

Appeal from the Order Entered February 24, 2014,
in the Court of Common Pleas of Lehigh County,
Civil Division at No(s):  2012-C-0518

BEFORE:  LAZARUS, WECHT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:　　　　　**FILED MARCH 24, 2015**

Nancy and Nicholas Nicolaou (the Nicolaous) appeal *pro se* from the trial court's February 24, 2014 order granting summary judgment in favor of James J. Martin, M.D.; Jeff D. Gould, M.D.; St. Luke's Hospital; St. Luke's Hospital & Health Network; St. Luke's Hospital Union Station Medical Surgical Clinic (d/b/a St. Luke's Southside Medical Center); St. Luke's Orthopedic Surgical Group; and Nazareth Family Practice (Appellees) in this medical malpractice action.  We reverse the order of the trial court.

_____
* Retired Senior Judge assigned to the Superior Court.

The trial court has summarized the factual and procedural history of this case as follows:

> The facts of the case provide that sometime in 2001, Nancy Nicolaou was bitten by a tick on her left ankle. Beginning in August, 2001, Mrs. Nicolaou began seeking medical treatment because she was experiencing a number of maladies that she associated with the tick bite. At first, Mrs. Nicolaou developed a rash near the sight of the bite and experienced numbness and tingling in her left toe, fatigue, and lower back pain. Over time, these symptoms expanded to include: incontinence, total loss of bladder control; tingling and numbness throughout her body, including both legs and feet; difficulty walking; and confinement in a wheelchair.
>
> Each of the [Appellees] acted as Mrs. Nicolaou's treating physician at different times between 2001 and 2008. Mrs. Nicolaou was a patient of dismissed co-defendant Dr. Stephen P. Falatyn, an alleged agent of [] St. Luke's Hospital and St. Luke's Health Network, in August of 2001. Mrs. Nicolaou was a patient of [] Dr. James J. Martin, an alleged employee of [] Nazareth Family Practice, from approximately June 14, 2002 through June 14, 2005. Mrs. Nicolaou was a patient of co-defendant Louise A. Dillonsnyder, CRNP,[1] an alleged agent of [] St. Luke's Hospital, St. Luke's Health & Health Network, and St. Luke's Hospital Union Station Medical Surgical Clinic, from May 27, 2005 through December 20, 2006. Mrs. Nicolaou was a patient of [] Dr. Jeffrey D. Gould, an alleged agent of [] St. Luke's Hospital and St. Luke's Hospital & Health Network, in 2007 and 2008.
>
> During Mrs. Nicolaou's treatment, Dr. Falatyn and [] Martin, Dillonsnyder, and Gould all ordered a battery of tests, including four Lyme Disease tests; none of the tests produced a positive result for Lyme Disease. Consequently the [doctors] did not diagnose Mrs. Nicolaou with or treat her for Lyme Disease.
>
> On July 3, 2006, [] Nurse Dillonsnyder ordered an MRI of the brain. The results of the MRI suggested that Mrs. Nicolaou could be suffering from either multiple sclerosis (MS) or Lyme Disease. [The doctors] diagnosed Mrs. Nicolaou with and treated

_____

[1] Louise Dillonsnyder was not included in the motion for summary judgment that is the subject of this appeal, and she subsequently was dismissed as a defendant. As such, she is not a party to this appeal.

her for MS. Dr. Gould told Mrs. Nicolaou that she did not have Lyme Disease and he continued to believe that she did not have Lyme Disease. Mrs. Nicolaou stopped [treatment] with the [Appellees] sometime in 2008.

Sometime in 2007, Mrs. Nicolaou suspected that the [doctors] incorrectly diagnosed her with MS and that she was actually suffering from Lyme Disease due to the symptoms she experienced near the 2001 tick bite. As a result, Mrs. Nicolaou sought the help of Nurse Practitioner Rita Rhoads after Mrs. Nicolaou learned through research on the internet that Nurse Rhoads had a history of treating patients for Lyme Disease whom other medical professionals had previously incorrectly diagnosed as suffering from MS. Mrs. Nicolaou met with and was examined by Nurse Rhoads on five occasions between July 20, 2009 and February 1, 2010, specifically: July 20, 2009; September 21, 2009; November 9, 2009; December 7, 2009; and February 1, 2010. During each of the appointments, Nurse Rhoads recorded an assessment of "probably Lyme [Disease]" stemming from the 2001 tick bite on Mrs. Nicolaou's left ankle and prescribed antibiotics to fight the Lyme Disease. Also, during each of the appointments, Nurse Rhoads told Mrs. Nicolaou that she believed Mrs. Nicolaou was suffering from Lyme Disease, and that, as a result of that diagnosis, Nurse Rhoads was prescribing antibiotics to fight the Lyme Disease.

During some of the appointments, Nurse Rhoads recommended that, in order to confirm Nurse Rhoads' diagnosis of Lyme Disease, Mrs. Nicolaou should undergo a test offered by a company called IGeneX, Inc. (IGeneX). Mrs. Nicolaou testified that she did not get the test before February 1, 2010, because she wanted to see how her symptoms were going to react to the antibiotics. Nurse Rhoads testified that Mrs. Nicolaou did not have the IGeneX test done when it was first recommended because Mrs. Nicolaou said she could not afford it. Mrs. Nicolaou testified that she voluntarily stopped purchasing medical insurance at some point in 2005 because her insurer was not covering the cost of many of the tests ordered by her physicians; she understood that she would be personally responsible for all costs associated with tests that might be ordered by her medical care providers going forward.

Nurse Rhoads administered the IGeneX Lyme Disease test to Mrs. Nicolaou on February 1, 2010. Nurse Rhoads sent Mrs. Nicolaou's test specimen to the IGeneX laboratory in Palo Alto,

California.  On February 12, 2010, IGeneX completed its analysis of the test.  On February 13, 2010, Nurse Rhoads informed Mrs. Nicolaou via e-mail that the test results were positive for Lyme Disease.

The day that Mrs. Nicolaou received the positive test results, she posted a message on her Facebook page that confirmed her subjective opinion that she believed she had Lyme Disease well before receiving the IGeneX report:

Today i got my blood test back from igenix [*sic*] labs to test for lyme disease and it came back positive!!!!!!!!!!!!!  i had been telling everyone for years i thought it was lyme and the doctors ignore me, thank you god you have answerd [*sic*] my prayers!!!!!!!!!  Now its [*sic*] all in your hands!!!!!!!!!!!!

[The Nicolaous] initiated this lawsuit [] by way of [a] complaint filed on February 10, 2012.  Amended complaints were filed on April 19, 2012 and May 31, 2012.  In the second amended complaint, Mrs. Nicolaou assert[ed] medical malpractice claims against each of the [Appellees].  Based on the injuries allegedly suffered by his wife as a result of the [] purported negligence, Mr. Nicolaou also assert[ed] claims [] for loss of consortium.

In their [answer], [Appellees] averred a violation of the statute of limitations as an affirmative defense to all of the [Nicolaous'] claims.

[The Nicolaous] averred in their second amended complaint that although they did not initiate this action until more than three years after Mrs. Nicolaou's last contact with the [doctors and hospitals], the statute of limitations is not a bar to their claims due to the operation of the discovery rule.  [The Nicolaous] assert that the [Appellees] are estopped from asserting a statute of limitations defense because reasonable people in the position of [Appellants] could not have discovered any negligence until February 13, 2010, at the earliest; the Complaint was filed within two years of that date.

Trial Court Opinion, 2/24/2014, at 2-6 (citations to the record omitted; some capitalization and punctuation modified).

On December 6, 2013, after discovery was completed, Appellees filed a motion for summary judgment. On December 31, 2013, the Nicolaous, through counsel, filed a response. On February 25, 2014, the trial court granted Appellees' motion, holding that the Nicolaous had commenced their action after the prescribed statutory period for bringing the claim had expired, and that the statute of limitations was not tolled by application of the discovery rule. *Id*. at 14.[2] On April 21, 2014, the Nicolaous filed a notice of appeal.[3] The trial court did not direct Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Nonetheless, in accordance with Pa.R.A.P. 1925(a), the trial court issued an opinion in support of its order on May 9, 2014.[4]

The Nicolaous raise the following issue for our review: "[w]hether the trial judge erred in granting Appellee[s'] motion for summary judgment and

---

[2] An action to recover damages for injuries to the person caused by the negligence of another must be commenced within two years. 42 Pa.C.S. § 5524(2).

[3] Although the Nicolaous filed the notice of appeal more than thirty days after the trial court's order granting summary judgment, the notice of appeal is not untimely. Louise Dillonsnyder was not included in the summary judgment motion, and therefore the order granting summary judgment was not a final order from which Appellant would need to appeal within thirty days pursuant to Pa.R.A.P. 903(a). A final order is any order that, *inter alia*, disposes of all claims and of all parties. Pa.R.A.P. 341(b)(1). All of the claims and parties to this action were not disposed of until Louise Dillonsnyder was dismissed from the action by praecipe dated March 28, 2014.

[4] The trial court's Rule 1925(a) opinion directs the reader to the opinion attached to its February 24, 2014 order granting summary judgment.

holding that [their] action was time barred under [42 Pa.C.S. § 5524(2)] and did not meet the discovery rule exception rather than having a jury determine the issue?" The Nicolaous' Brief at 2.

We set forth our standard of review from an order granting summary judgment.

> The standards which govern summary judgment are well settled. When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion.…

*Swords v. Harleysville Ins. Companies*, 883 A.2d 562, 566-67 (Pa. 2005) (citations omitted).

We also set forth the principles of law governing claims with respect to the expiration of the statute of limitations and the discovery rule.

> The discovery rule originated in cases in which the injury or its cause was neither known nor reasonably knowable. The purpose of the discovery rule has been to exclude from the running of the statute of limitations that period of time during which a party who has not suffered an immediately ascertainable injury is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury.

As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause….

Therefore, when a court is presented with the assertion of the discovery rules application, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. Since this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it. Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.

When the discovery rule applies, the statute of limitations does not commence to run at the instant that the right to institute suit arises, *i.e.*, when the injury occurs. Rather, the statute is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct. Whether the statute of limitations has run on a claim is a question of law for the trial court to determine; but the question as to when a party's injury and its cause were discovered or discoverable is for the jury.

*Fine v. Checcio*, 870 A.2d 850, 858-59 (Pa. 2005) (citations and quotation marks omitted).

Furthermore, we have also observed that

[p]ursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors. Thus, once the running of the statute of limitations is properly tolled, only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law.

***Crouse v. Cyclops Indus.***, 745 A.2d 606, 611 (Pa. 2000) (citations and quotations omitted; emphasis in original).

On appeal, the Nicolaous argue that the issue of when Mrs. Nicolaou "should have been reasonably aware that she suffered a misdiagnosis is generally an issue of fact to be determined by the jury." The Nicolaous' Brief at 4.[5] The trial court disagreed, holding that in this case "the evidence supports the conclusion that the commencement of the statute of limitations period began prior to February 10, 2010, and that such evidence is so clear that reasonable minds could not differ regarding that fact." Trial Court Opinion, 2/24/2014, at 9.[6] Viewing the facts in the light most favorable to the Nicolaous, we disagree.

---

[5] Appellees and the Dissent argue that we should dismiss this appeal because of the Nicolaous' failure to comply with Pa.R.A.P. 2119. ***See*** Appellees' Brief at 12-14. We recognize that the argument quoted *supra* is actually set forth in the Summary of Argument section of the Nicolaous' brief, as opposed to the Argument section. ***See*** The Nicolaous' Brief at 4-5. However, the argument is clearly stated and is the same argument briefed and argued before the trial court.

Moreover, we recognize the Nicolaous do not cite relevant legal authority in either section. However, neither the parties nor the trial court disputes the relevant case law. The issue before us is whether the trial court erred in its application.

A determination about whether this Court should dismiss an appeal for failure to comply with appellate rules is discretionary. ***PHH Mortgage Corp. v. Powell***, 100 A.3d 611 (Pa. Super. 2014). Because the argument is easily discernable by this Court, we decline to dismiss the appeal as suggested by Appellees and the Dissent.

[6] The Nicolaous filed a complaint on February 10, 2012.

While there is no question that Mrs. Nicolaou suspected she had Lyme Disease in July of 2009 when she began treating with Nurse Rhoads, and Nurse Rhoads offered Mrs. Nicolaou what would have been her fifth Lyme Disease test at that time, Nurse Rhoads acknowledged that Mrs. Nicolaou turned down this Lyme Disease test because she had "no money." N.T., 11/1/2013, at 23. Moreover, even though Mrs. Nicolaou's symptoms began to improve within a month of being treated as if she had Lyme Disease, she had no medical confirmation of having Lyme Disease. On February 1, 2010, Mrs. Nicolaou agreed to have the new Lyme Disease blood test performed. On February 13, 2010, Mrs. Nicolaou's Lyme Disease test came back positive. Mrs. Nicolaou filed her complaint less than two years later, on February 12, 2012.

> A plaintiff's actions must be evaluated … to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others. In other words, a party is not under an absolute duty to discover the cause of his injury. Instead, he must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case.

*Crouse*, 745 A.2d at 611-12.

Because reasonable minds could differ as to whether Mrs. Nicolaou acted with reasonable diligence in choosing to delay her fifth Lyme Disease test, "the question as to when [Mrs. Nicolaou's] injury and its cause were discovered or discoverable is for the jury." *Fine*, 870 A.2d at 859.

Accordingly, we hold that the trial court erred in granting summary judgment, and we reverse the order of the trial court.

Order reversed. Jurisdiction relinquished.

Judge Lazarus joins the memorandum.

Judge Wecht files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/24/2015