# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of Deborah Ball and Richard Ball | : | |
| | : | |
| | : | |
| From Decision of City of Philadelphia Tax Review Board | : | |
| | : | |
| | : | |
| Appeal of: Deborah Ball and Richard Ball | : | No. 1472 C.D. 2023 |
| | : | Submitted: April 8, 2025 |


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MATTHEW S. WOLF, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                                          FILED:  May 7, 2025


Before the Court is Deborah and Richard Ball's (collectively, Homeowners) appeal of the order of the Court of Common Pleas of Philadelphia County (trial court) affirming the Philadelphia Tax Review Board's (TRB) adjudication that denied Homeowners' appeal of the City of Philadelphia's (City) assessment of a bill for emergency repairs performed on Homeowners' residential property.  After careful review, we conclude that Homeowners failed to prove their theory of promissory estoppel before the TRB.  Accordingly, we affirm.

Homeowners contracted with Anthony A. Smith, a Registered Master Plumber (Mr. Smith), to perform external plumbing work at their property located at 106 West Walnut Park Drive, Philadelphia (Property).  Reproduced Record (R.R.) at 66a.  The City's Department of Licenses and Inspections (L&I) issued a plumbing permit for the work, and on August 15, 2018, L&I sent an inspector to approve a

trench that Mr. Smith had excavated to complete the work. *Id.* The work was not approved by L&I's inspector, and the following day, August 16, 2018, the trench collapsed, tragically killing Mr. Smith. *Id.*

As a result of this emergency, L&I's Director of Emergency Services, Stephen Gallagher (Director Gallagher), was dispatched to the Property. *Id.* at 66a-67a. Director Gallagher advised Homeowners that they needed to immediately hire another plumber to fix the damage to the Property's foundation caused by the trench collapse and complete the work or else the City would hire a contractor for them. *Id.* The City ultimately hired a contractor and the work was completed on August 17, 2018, through August 20, 2018. On August 20, 2018, L&I formally issued an Initial Notice of Violation to Homeowners, declaring the Property unsafe pursuant to Section PM-108.1 of the Philadelphia Property Maintenance Code.[1] *Id.* at 28a. Homeowners were subsequently assessed a bill totaling $87,061.36 for the work performed by the City's contractor plus administrative fees and interest (Bill of Costs).[2] *Id.* at 39a.

Homeowners appealed the Bill of Costs to the TRB, which held a hearing on September 16, 2021. At the hearing, Deborah Ball and City Inspector Tom Rybakowski testified. Mrs. Ball testified as to her memory of the events

---

[1] Section 108.1 provides:

> When a structure, equipment, or shared retaining wall is found by the code official to be unsafe, or when a structure is found unfit for human occupancy, or is found unlawful, such structure shall be condemned pursuant to the provisions of this code.

Phila. Pa. Property Management Code § 108.1, 1997. The Philadelphia Property Management Code may be accessed at: https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-271402 (last visited May 6, 2025).

[2] The assessment was broken down as: $60,976.00 for labor/materials; $12,804.96 for administrative costs; and $13,280.40 for interest. R.R. at 39a.

surrounding the trench collapse and related interactions with City personnel. In particular, Mrs. Ball testified that Director Gallagher stated he would "make her whole" and "fix this for [her]." R.R. at 73a. Following Mrs. Ball's testimony, Inspector Rybakowski testified as to the nature of the damage and necessary emergency plumbing and repair work. He reviewed the notes of the inspector dispatched to approve Mr. Smith's work and noted that Mr. Smith was told the work was not ready to proceed and was reminded to use proper shoring on the trench. *Id.* at 7a-76a. Inspector Rybakowski also contended that the trench collapse was caused by Mr. Smith's improper shoring, which resulted in damage to a structural wall, necessitating emergency repair. *Id.* at 79a. He went on to discuss the details of the work performed and the amounts charged for that work and explained how it related to the unfinished work and damage from the trench collapse.[3] *Id.* at 77a-80a. At the conclusion of the hearing, the TRB allowed the parties to submit additional briefs and invited the submission of written statements by Homeowners and Director Gallagher (the latter of whom had not testified at the hearing). *Id.* at 81a-82a.

Director Gallagher subsequently submitted a written statement, denying Mrs. Ball's assertion that he promised the City would pay for the work. His statement provided:

---

[3] Full recitation of these technical details is unnecessary for our analysis in this case. However, we note that before the TRB, Homeowners argued that the work performed was for the City's benefit, not Homeowners' benefit, and thus they should not be charged for it. The TRB rejected this argument, finding Inspector Rybakowski's testimony probative in clarifying that all work for which Homeowners were charged was directly related to completing the plumbing work for the benefit of Property and fixing the collapsed trench. *See* R.R. at 80a (Inspector Rybakowski's testimony that all work was done "in conjunction with the collapse and the emergency response that was done being that this property was declared as unsafe and it was also uninhabitable being that it had no water service nor sanitary lines"). Contrary to Homeowners' counsel's contention at the hearing, Inspector Rybakowski clarified that Homeowners were not charged for any work for City's benefit. Homeowners did not advance this argument before the trial court or this Court, and thus, we do not discuss it further.

4. I was personally involved in the emergency abatement of the imminently dangerous conditions at [the Property] on or around August 16, 2018 through 20, 2018.

5. I recall speaking with Mrs. Ball at her [P]roperty. I did speak to her on a few different occasions during the incident at her [P]roperty.

6. The last conversation I had with Mrs. Ball and her husband was after the work came to a close for one of the days in question. During that conversation I suggested that Mr. and Mrs. Ball not worry about their [P]roperty at the moment, and that "we," meaning the City, would clean up and secure the outside area of the house. I recommended that they not stay at the house due to what happened that day and that the house had no running water, no storm and drainage to the outside of the house, due to the work being performed.

7. Additionally, I suggested they talk to a lawyer because of what happened, to see if the [Mr. Smith's] contractor's insurance would cover the work that was not completed, because of what had happened at her [P]roperty.

8. Before I left her house that night, I asked Mr. and Mrs. Ball to look for a plumbing contractor to complete the work that was started and left undone at her property and to call me if she couldn't find one – meaning that "we," the City, would hire a plumber to complete the work.

9. At no time during any conversation that I had with [] Mr. and Mrs. Ball, or anyone else, did I say that the [C]ity would pay for this work that had to be completed. . . .

R.R. at 64a-65a.

Mrs. Ball submitted a written statement reasserting her contention that Director Gallagher told Homeowners they would not have to pay for the work performed by the City's contractor. R.R. at 18a-20a. She explained that "[b]ecause

4

of that statement, we took no further steps to obtain a plumber or contractor to perform any work caused by the collapse." *Id.* at 19a.

The TRB issued a determination on November 1, 2022, affirming the Bill of Costs as modified. R.R. at 68a. While concluding that Homeowners were responsible for the cost of abating the emergency conditions, the TRB noted that it was sympathetic to the "traumatic event" that occurred at Homeowners' Property and therefore removed the administrative fee and interest charged to them. *Id.* In so holding, the TRB ultimately credited Director Gallagher's statement that the City never promised Homeowners it would pay for the abatement work performed. *Id.* The TRB concluded:

> [T]here remains some doubt regarding whether Mr. Gallagher [sic] statements about making the [Homeowners] "whole" implied that the City would in fact provide all these services for free. Aside from Ms. Ball's testimony there is no additional evidence to support the promises that [she] alleges were made by Mr. Gallagher; especially, when Mr. Gallagher's affidavit specifically refutes those allegations. (Dated October 21, 2021).

*Id.*

Homeowners subsequently appealed the TRB's decision to the trial court, arguing that the TRB committed an error of law by failing to find that the evidence adduced established equitable or promissory estoppel against the City with respect to the Bill of Costs. The trial court rejected Homeowners' argument based on provisions of the Philadelphia Property Management Code in concert with the TRB's findings of fact. Specifically, the trial court cited Section 110.6 of the Philadelphia Property Management Code, which provides:

5

**Costs of emergency repairs**: Where the code official incurs costs of emergency repairs whether by itself or by contract, *such costs shall be charged to the owner*. The code official shall, with the approval of the Law Department, collect such costs from the owner by lien or otherwise.

Trial Court Op. at 6 (citing Philadelphia Property Management Code § 110.6) (emphasis added). The trial court explained that on appeal,

> [Homeowners] have provided zero additional evidence or rationale to support their accounting of events. It strains credibility that Mr. Steven Gallagher, as Director of L&I's Emergency Department, would provide [Homeowners] with information completely opposite of what the Philadelphia [Property Management] Code statutorily directs. Nor does it logically follow that Director Gallagher, after in advance absolving the [Homeowners] of all responsibility, would then instruct [Homeowners] to seek legal counsel to see if [H]omeowners' insurance would cover the repair costs.

*Id.* at 9. Accordingly, the trial court concluded that

> [w]ithout validation of their claim of a promise or misrepresentation, [Homeowners] could not meet their evidentiary burden to establish either theory of estoppel. Therefore, the TRB committed no error in denying this claim.
>
> [Homeowners'] entreaty to reverse the TRB's factual determination equated to an improper request for this Court to weight credibility and evidence anew. Furthermore, this Court concluded that the TRB's rationale had been soundly based upon the cumulative evidence that had been presented after full and fair hearing.

*Id.* at 8.

6

Homeowners appealed the trial court's order to this Court, asserting that the facts of record establish that the City is estopped from collecting any amount of money for work performed at the Property by the City's contractor.[4]

In their brief, Homeowners argue that the City's actions and statements deprived them of the opportunity to obtain a contractor to perform the work at their Property for a substantially lesser amount. First, they assert that while the City concluded the Property was uninhabitable and required emergency action, they had arranged to stay in a local hotel for the week that Mr. Smith was planning to perform the sewer work. Therefore, after the trench collapse, the Property was not "uninhabitable" in the sense that the work must be completed immediately because Homeowners had secured other temporary living arrangements. Nevertheless, Homeowners argue that this emergency declaration afforded them less than 24 hours to obtain a contractor of their choice to complete the work. Homeowners argue that in this small window of time, they relied to their detriment on Director Gallagher's statement that the City would pay for the cost of the work performed by the City's contractor. Relying on this statement, they took no steps to seek out a contractor of their own choosing and negotiate a price that they could afford to complete the work.

The City responds that Homeowners' argument suffers from both factual and legal defects. Factually, the City submits that the TRB credited the account of Director Gallagher over that of Mrs. Ball and concluded that Director Gallagher did not state or imply that the City would pay for the cost of completing the work at their Property. As the TRB was the sole finder of fact and weigher of

---

[4] "In evaluating the decision of an agency, where a complete record is made before that agency, our standard of review is whether the agency committed an error of law and whether the material findings of fact are supported by substantial evidence." *Piatek v. Pulaski Twp.*, 828 A.2d 1164, 1170 (Pa. Cmwlth. 2003) (internal citations and quotations omitted).

7

credibility, the City asserts that this credibility determination may not be second guessed on appeal. In support of their estoppel claim, Homeowners merely advance their preferred version of the facts, but that version was not credited and cannot sustain their appeal. The City argues that Homeowners' estoppel argument fails on this basis alone.[5]

Estoppel may be used defensively (equitable estoppel) or as a cause of action (promissory estoppel), with the necessary elements of each being identical. *Travers v. Cameron County School District,* 544 A.2d 547, 550 (Pa. Cmwlth. 1988). To establish estoppel, it must be shown that "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000). Each of these elements are strictly enforced and must be proven by the party raising estoppel by clear unequivocal evidence. *Peluso v. Kistner*, 970 A.2d 530, 533 (Pa. Cmwlth. 2009), *Foster v. Westmoreland Cas. Co.*, 604 A.2d 1131, 1134 (Pa. Cmwlth. 1992).

Moreover, as the ultimate fact-finder, the TRB has the authority to resolve evidentiary conflicts and to make all necessary credibility determinations. *Guadalupe v. Phila. Bd. of Pensions & Ret.*, 243 A.3d 1020, 1025 (Pa. Cmwlth. 2020). This Court "may not substitute its judgment for that of the [TRB], which is

---

[5] Alternatively, the City argues that even if Director Gallagher had made a misrepresentation to Homeowners regarding payment to complete the work, estoppel would still not apply because any such representation by Director Gallagher, as an employee of the City, is outside his authority and in contravention of the Philadelphia Property Management Code. *See Cent. Storage Transfer Co. v. Kaplan*, 410 A.2d 292, 294 (Pa. 1979) (the doctrine of estoppel may be applied against a municipality based upon a municipal official's act, but not if those acts are "outside the agent's power" or "in violation of positive law").

the sole fact-finder, determiner of credibility, and assigner of weight to the testimony." *Id.* (quoting *Hinkle v. City of Phila.*, 881 A.2d 22, 28 (Pa. Cmwlth. 2005)).

As explained above, to prevail on a theory of estoppel, Homeowners were required to prove by unequivocal evidence that Director Gallagher "made a promise that he should have reasonably expected to induce action or forbearance on the part of" Homeowners. In support of this first requirement to establish estoppel, Homeowners continue to advance their position that Director Gallagher stated that the City would pay for the work completed at the Property, which caused them to forego choosing their own contractor. However, Homeowners' position is at odds with the TRB's determinations, which credited Director Gallagher's written statement that he did not make any such promise to Mrs. Ball. In explaining this credibility determination, the TRB stated that Mrs. Ball failed to present any additional evidence to support that a promise was made to Homeowners and that Director Gallagher's written statement specifically refutes those allegations. R.R. at 68a. As the ultimate fact-finder and determiner of credibility, the TRB's credibility determinations are binding on appeal. While the Court is sympathetic to Homeowners' situation, we unfortunately cannot conclude that they have established the first requirement to establish estoppel. Accordingly, we are constrained to affirm the trial court's order.

_____
MATTHEW S. WOLF, Judge

9

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Appeal of Deborah Ball and   :
Richard Ball   :
  :
From Decision of City of Philadelphia   :
Tax Review Board   :
  :
Appeal of: Deborah Ball and Richard   :   No. 1472 C.D. 2023
Ball   :

# **O R D E R**

AND NOW, this 7th day of May 2025, the Court of Common Pleas of Philadelphia County's February 8, 2023 Order is AFFIRMED.

_____
MATTHEW S. WOLF, Judge