J-A33008-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CHRISTOPHER GUTTERIDGE AND APPLIED ENERGY PARTNERS, LLC | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| J3 ENERGY GROUP, INC., T/D/B/A J3 ENERGY GROUP AND STEPHEN RUSSIAL | |
| Appellants | No. 3397 EDA 2013 |

Appeal from the Judgment Entered November 25, 2013
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2009-09160-CA

BEFORE:  LAZARUS, J., WECHT, J., and STRASSBURGER, J.[*]

MEMORANDUM BY STRASSBURGER, J.:           **FILED NOVEMBER 17, 2015**

J3 Energy Group, Inc. (J3) and Stephen Russial (Russial) (collectively Appellants) appeal from the judgment entered in favor of Christopher Gutteridge (Gutteridge) and Applied Energy Partners, LLC (AEP) (collectively Appellees), in the amount of $343,887.00.  We vacate the judgment and remand the matter to the trial court with instructions.

The background underlying this matter can be summarized as follows. In 2004, Gutteridge formed AEP, which sold electronic motor controls and energy saving lighting products to commercial and industrial customers. AEP conducted its business through approximately fifteen sales agents

_____

[*] Retired Senior Judge assigned to the Superior Court.

known as channel partners. Channel partners who owned businesses would buy products from AEP at discounted prices and sell them to their customers at higher prices. Channel partners who did not own a business were paid a commission by AEP for the sales they generated.

The case before us arises out of business dealings between AEP and J3, a corporation founded by Russial in 2002. J3 provides energy procurement[1] and demand response services[2] to commercial and industrial clients.

---

[1] At trial, Gutteridge provided the following definition of "procurement."

> Procurement is the business of helping the end-user consumer buy their electricity or natural gas most advantageously. Ten or 15 years ago all utilities were fully regulated and you had no choice. Over the last ten or 15 years various states have become deregulated, so now end[-]user consumers can buy their own electricity from ten to 15 different potential suppliers.

N.T., 6/12/2012, at 31.

[2] At trial, Gutteridge provided the following definition of "demand response."

> Demand response, or curtailment, as it is otherwise known, is the business where a utility will pay a large electrical user to curtail their usage on days when the electrical grid has a high load, which are nearly always summer afternoons. If the load on the grid gets too high, they send out a message. And those people who have signed up for demand response, and who will be paid for doing it, agree to curtail their use during those periods.

N.T., 6/12/2012, at 30.

Gutteridge and Russial met in 2007 and, over time, developed a plan whereby AEP would use its channel partners to provide J3's services to its customers. They discussed forming a joint venture called the Energy Buyers Group (the Group). The Group's members would benefit from lower electric supply costs that the Group would negotiate for them.

Gutteridge and Russial agreed that the revenue generated by the Group would be divided as follows: 60% to J3 and 40% to AEP. However, in the beginning, the revenue would be divided 65% to J3 and 35% to AEP because J3 would be heavily involved in closing the sales while the AEP channel partners were learning about energy procurement and demand response services. It was further decided that AEP would pay the channel partners 20% of the total revenue and retain a net commission of 15%.

At an AEP meeting in January of 2008, Gutteridge introduced the channel partners to Russial and J3. At training sessions in January and May of 2008, the Group concept was discussed, and Russial explained how J3's services worked and how to sell them.

Only two of the channel partners, Lori Porreca (owner of A1 Restoration, Inc. and A1 Energy, Inc.) and Herb Keaton (owner of Plastic Machinery Sales) sold the Group's services because they were the sole

partners with customers in the PPL utility area, which was scheduled to become deregulated in January of 2010.[3]

At the initial meetings in 2008, Russial told the channel partners that it was important for the Group to reach 50 megawatts of purchasing volume because that was the amount needed to secure optimum pricing from energy suppliers. On February 25, 2009, Russial sent an email confirming that the Group had reached this threshold.

Although Gutteridge maintained that he and AEP made significant efforts to market the Group, Russial became dissatisfied with AEP's performance. On March 9, 2009, Russial sent Gutteridge an email setting forth a proposal that J3 compensate directly A1 Restoration, Plastic Machinery Sales, and AEP channel partner Mark Burton for any sales they close. Under the new proposal, J3 would pay AEP a 10% or 20% referral fee for any sales generated by channel partners other than Porreca, Keaton, or Burton, depending on the extent of Appellants' involvement. This referral fee was less than the share being paid to AEP under the existing arrangement. The proposal also included a requirement that AEP sign a non-compete agreement for any existing or new clients of the Group.

On April 21, 2009, Russial sent an email to Gutteridge informing him that he would not make any payments to AEP from J3 unless Appellees

---

[3] The other large utilities in Pennsylvania, PECO and MetEd, were scheduled to deregulate in January 2011.

agreed to sign a document prepared by Russial that would include a non-compete clause for any customers secured by Porreca, Keaton, or Burton. AEP never signed a new agreement with J3, and J3 never paid AEP for any of the revenues generated from the Group joint venture.

Appellants voluntarily paid channel partners Porreca and Keaton directly for their services, rather than Appellees. They also had Porreca and Keaton sign non-compete agreements, which caused Appellees to lose two key channel partners and resulted in the customers Porreca and Keaton had obtained for the Group becoming direct customers of J3.

Appellees commenced this action by filing a writ of summons on August 14, 2009. They filed a complaint on May 10, 2010, raising several counts against Appellants, including promissory estoppel, breach of contract, unjust enrichment, breach of implied duty of good faith, and tortious interference with contractual rights. A four-day non-jury trial before the Honorable William P. Mahon began on June 12, 2013 and concluded on June 15, 2013. On June 30, 2013, the court issued a verdict in favor of Appellees in the amount $343,887.00 on the counts of unjust enrichment and promissory estoppel. The verdict was not filed until July 3, 2013, and is date-stamped as "sent" on July 8, 2013.

On July 12, 2013, Appellants filed motions for post-trial relief, and Appellees did the same on July 15, 2013. Because the trial court did not rule on the post-trial motions within 120 days, Appellants filed a praecipe for

entry of judgment on November 25, 2013. Pa.R.C.P. 227(1)(b). Judgment was entered the same day. Appellants timely filed a notice of appeal.

Appellants present the following questions for our consideration:

1. Did the trial court abuse its discretion and/or commit an error of law in holding ... Russial, who was the shareholder and corporate officer of [J3], personally liable for any amount under the theories of unjust enrichment/promissory estoppel or any other basis?

2. Did the trial court abuse its discretion and/or commit an error of law in finding liability against both or either of [] Appellants under the theory of promissory estoppel?

3. In the event that either or both of [] Appellants did in fact have liability under the legal theory of promissory estoppel, did the trial court abuse its discretion and/or commit error of law and apply the wrong measure of damages?

4. Did the trial court abuse its discretion and/or commit an error of law in finding liability against either or both of [] Appellants under the theory of unjust enrichment?

5. In the event that either or both of [] Appellants did in fact have liability under the legal theory of unjust enrichment, did the trial court abuse its discretion and/or commit error of law and apply the wrong measure of damages?

6. In the event [this] Court affirms liability on either or both [] Appellants under unjust enrichment and/or promissory estoppel and affirms that [] Appellees were entitled to damages based on lost commissions as opposed to reliance damages, was the amount of the trial court's verdict excessive and an abuse of discretion and/or an error of law?

Appellants' Brief at 4-6.[4]

Our standard of review in nonjury cases is limited to:

---

[4] We have reordered Appellants' issues for ease of discussion.

a determination of whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed on appeal absent error of law or abuse of discretion. When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected.

*Company Image Knitwear, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 330 (Pa. Super. 2006) (citation omitted).

Appellants assert that the trial court abused its discretion and committed an error of law by holding Russial personally liable for AEP's damages. Appellants essentially contend that the verdict against Russial is not supported by sufficient evidence. We agree with Appellants.

AEP is a limited liability company, and J3 is a corporation. Yet, the trial court's verdict holds Russial, the stockholder and officer of J3, personally liable for the damages sustained by AEP. In its opinion, the trial court isolates portions of Gutteridge's testimony in support of that decision.

The following exchange between Appellants' counsel and Gutteridge was central to the court's decision.

Q: At your deposition I remember asking you when you met Steve Russial were you aware of his company, J3 Energy Group, Inc., were you aware of that company?

A: Yes.

Q: And were you aware that the company was a corporation?

A: No, not specifically, but I assumed so.

- 7 -

***

Q: Mr. Gutteridge, I'm handing you your deposition on January 6, 2012 of this year. I'm bringing your attention to page 26, lines 14 through 21. Would you read those and let me know when you're finished?

A: "Let's talk about that. One of my clients is J3 Energy Group Inc. Were you aware of J3 Energy Group, Inc. when you started dealing with Mr. Russial?"
"Yes."
"Were you aware that that was a corporation?"
"Yes."

***

Q: I also asked you if, when you were dealing with Mr. Russial, were you dealing with him in his capacity as president of this corporation – of his corporation. You don't remember what your answer was?

A: I don't remember what my answer was, but when I first met Mr. Russial, I was dealing with him personally. At the point that we started setting up the Energy Buyers Group, it was Applied Energy Partners J3 venture.

Q: I'm going to approach you one more time.
If I show you, again, page 26, the last three lines, and then your answer on the top of your deposition testimony?

A: Yes. You asked me in my dealings with Mr. Russial was he always dealing as president of J3 and I said I assumed so.

Q: Thank you.

N.T., 6/13/2012, at 8-10.

The trial court credited Gutteridge's testimony that, when he first met Russial, Gutteridge believed that he was dealing with Russial personally. The court basically concluded that, because the J3 and AEP were unable to work out a contract, Russial is personally liable for the damages caused to AEP.

Only extraordinary cases allow for corporate liability to be passed along to owners or officers of corporations. *See Villiage at Camelback Prop. Owners Assn. Inc. v. Carr*, 538 A.2d 528, 533 (Pa. Super. 1988) ("Piercing the corporate veil is admittedly an extraordinary remedy preserved for cases involving exceptional circumstances. As some courts have phrased it, liability for the acts of a corporation may be assessed against the owners thereof wherever equity requires that such be done either to prevent fraud, illegality or injustice or when recognition of the corporate entity would defeat public policy or shield someone from public liability for crime."). Here, in concluding that Russial is personally liable for damages caused by J3, the trial court relied on Gutteridge's testimony that, when Gutteridge first met Russial, Gutteridge was dealing with Russial personally. Yet, immediately after making this statement, Gutteridge testified, "At the point that we started setting up the Energy Buyers Group, it was Applied Energy Partners J3 venture." N.T., 6/13/2012, at 10.

Stated simply, regardless of Gutteridge's purported belief that he was dealing with Russial when they first met, the evidence admitted at trial clearly demonstrates that, at all times relevant to this appeal, AEP and J3 were the parties to the failed business deal. Thus, the trial court had no grounds upon which to hold Russial personally liable for the damages J3 caused to AEP. The judgment, therefore, must be adjusted accordingly.

Appellants next assert that the trial court abused its discretion or committed an error of law by finding liability under the theory of promissory estoppel. Our Supreme Court has explained the doctrine of promissory estoppel as follows:

> Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment. In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise. As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute.

*Crouse v. Cyclops Industries*, 745 A.2d 606, 610 (Pa. 2000) (citations omitted).

Appellants argue that "[t]here was no evidence presented by [] Appellees and the trial court made no findings in its [v]erdict or [o]pinion finding any of the three elements of promissory estoppel against either or both of [] Appellants." Appellants' Brief at 43. We disagree.

Here, the court found evidence that Appellants made promises to Appellees that were expected to induce action by Appellees. More specifically, the court credited Gutteridge's testimony. Gutteridge testified, *inter alia*, that Russial personally promised a revenue sharing arrangement

- 10 -

whereby J3 would pay AEP a percentage of the revenues generated from AEP's sales efforts. *See*, *e.g.*, N.T., 6/12/2012, at 167-69;

There also was evidence that Appellants' promises induced Appellees to take various actions. For instance, as a result of Russial's promises, Gutteridge introduced Russial and J3 to the AEP channel partners, who made several sales calls to potential customers to market the Group. Furthermore, Gutteridge testified that AEP sought only to become involved in the demand response and procurement market based on Appellants' promises to enter into the shared revenue arrangement. N.T., 6/12/2012, at 187.

Lastly, the court concluded that "[e]quity demands that [Appellees] recover on the theory of promissory estoppel to the extent that [Appellants] are unjustly enriched by 35% of the revenues that would otherwise be paid to [Appellees]." Trial Court Opinion, 6/11/2014, at 4. In other words, permitting recovery on the promise is the only way to avoid injustice. *See* **Crouse**, 745 A.2d at 610. This conclusion is supported by the credible testimony that, once the Group met its target of 50 megawatts of purchasing volume, Appellants decided they were unhappy with Appellees' work.

Appellants then refused to pay Appellees unless they signed an agreement that would cut them out of the Group and allow Appellants to use the AEP sales force for their exclusive gain. Appellees rejected this offer,

- 11 -

and Appellants refused to pay them the agreed upon 35% of the revenues generated by the channel partners, which amounted to $343,887.

Appellants then began paying directly AEP's two most productive channel partners, Porreca and Keaton, for their services and had them sign non-compete agreements. Appellees thus lost the ability to sell to the clients of Porreca and Keaton, including the ability to sell them the services of their new vendor for energy procurement services, World Energy.

Appellants argue there was no injustice in this case because "Appellees did not perform as they represented they could and would[.]" Appellants' Brief at 44. Relying heavily on Russial's testimony, Appellants claim that Appellees failed to identify 12 to 14 sales agents, as they represented they could. Appellants also claim that Appellees purported to have a network of agents who could sell J3's services without J3's being involved in training or operating the network or closing sales. However, in light of the trial court's statement that it "finds credible the testimony of … Gutteridge when considered against that of … Russial," Trial Court Opinion, 6/11/2014, at 1, Appellants' contention that no injustice occurred evanesces.

Instead, the court had before it the credible testimony of Gutteridge that it was only when the 50 megawatt goal was reached, and the Group was about to realize revenues, that Appellants communicated any dissatisfaction with Appellees' efforts, and then engaged in conduct to lure away Appellees' most successful channel partners. Under these

circumstances, the trial court did not err in concluding that the doctrine of promissory estoppel applied in this matter.

Appellants next argue that, even if the trial court correctly found liability under the theory of promissory estoppel, it should have awarded only reliance damages to Appellees.

RESTATEMENT (SECOND) OF CONTRACTS, §90(1), Comment d, provides, in relevant part:

> A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate. But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy. In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise.

Accordingly, the general rule is that a plaintiff should be awarded the value of the defendant's promises unless equity dictates otherwise. Although Appellants cite **Banas v. Matthews Int'l Corp.**, 502 A.2d 637 (Pa. Super. 1985), for the general proposition that "any recovery under promissory estoppel would be for reliance damages," Appellants' Brief at 46, they paint with too broad a brush. Rather, as our Supreme Court noted, a promissory estoppel remedy may be limited as justice requires. **Lobolito, Inc. v. North Pocono Sch. Dist.**, 755 A.2d 1287, 1292 n.10 (Pa. 2000). Therefore, the issue is whether the trial court correctly found that the instant case does not involve equitable considerations that would justify a deviation from contract damages based on the value of the Appellants' promises.

Here, the trial court heard evidence regarding the sales and marketing activities that Appellees performed in reliance on Appellants' promises. It also heard testimony regarding the losses that Appellees sustained as a result of relying on those promises. Under these circumstances, an award of contract damages that gave Appellees the benefit of their bargain was appropriate, and Appellants have not demonstrated any equitable concerns that would justify a lesser calculation of damages.

Appellants also contend that the trial court abused its discretion and/or committed an error of law by finding in favor of Appellees on their claim of unjust enrichment. This Court held that

> [a] claim for unjust enrichment arises from a quasi-contract. A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another.
>
> > The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.
> >
> > Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

***Stoeckinger v. Presidential Financial Corp. of Delaware Valley***, 948 A.2d 828, 922 (Pa. Super. 2008) (citations and quotation marks omitted).

"To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." ***Torchia v. Torchia***, 499 A.2d 581, 582 (Pa. Super. 1985) (quotation marks and citation omitted). Here, the trial court found credible evidence that Appellants committed wrongful acts by breaking their promises to Appellees after Appellees performed services in reliance on those promises. As a result, Appellants kept all of the revenues from the Group that were obtained through Appellees' efforts and secured exclusive relationships with AEP's most productive channel partners.

Appellees presented credible evidence that the benefits that Appellants secured unjustly were equal to the amount of money Appellees would have received from Appellants had they not broken their promises. ***See*** Exhibit P-64 (showing total revenue received by J3 for both procurement and demand services through December 21, 2011, totaling $982,537). Accordingly, the trial court concluded that Appellees were unjustly enriched by retaining thirty-five percent of that amount, *i.e.*, $343,887.00. Consequently, assuming *arguendo* that Appellees failed to establish the elements of promissory estoppel, the trial court correctly concluded that Appellees

proved that they were entitled to damages pursuant to the doctrine of unjust enrichment.

Appellants argue that, even if the court did not err in awarding lost commissions, the verdict was excessive and improperly calculated. They contend that, at the most, Appellees were entitled to a commission of fifteen percent, which is the net they would have earned after paying commissions to A1 and/or Plastic Machinery Sales. Additionally, Appellants note that J3 did, in fact, pay commissions of twenty cents on every dollar directly to A1 and Plastic Machinery Sales. Accordingly, they assert that the verdict "essentially penalizes Appellants and creates an unwarranted windfall for the Appellees." Appellants' Brief at 51.

With respect to this issue, the trial court concluded, "[Appellants'] willingness to pay AEP's sales commissions to Porreca and Keaton [does] not entitle them to a 'credit' against any claims that [Appellees] have against [Appellants] nor does it relieve [Appellants] of any sales commission obligations that [they] may have to Porreca and Keaton." Trial Court Opinion, 6/11/2014, at 5. We disagree.

J3 paid the commissions due to Porreca and Keaton. Yet, in calculating damages, the trial court failed to account for these payments. No viable legal vehicle exists by which these channel partners could recover commissions from AEP that J3 already paid to them. Indeed, the law frowns upon double recovery. *Cf. Judge Technical Servs., Inc. v. Clancy*, 813

A.2d 879, 887 (Pa. Super. 2002) ("[A]n injured party cannot recover twice for the same injury, based on the theory that double recovery results in unjust enrichment."). Thus, the judgment must be reduced to account for the paid commissions.

Lastly, Appellants argue that the trial court erred by awarding Appellees damages on any contracts entered into after March 5, 2009, the date on which J3 informed AEP that J3 no longer intended that the companies would work together. Appellants rely on Exhibit D-20, which contains a calculation, explained in Russial's testimony, that only $396,574 of J3's revenue came from contracts that it obtained through the channel partners' efforts before March 5, 2009. Based on this figure, and Appellants' insistence that Appellees were entitled to only a fifteen percent commission, they argue that the verdict should be reduced to $59,486.10.

The trial court did not abuse its discretion in determining there was no basis to separate revenue from contracts generated by AEP's channel partners after March 2009 from revenue generated from contracts generated by them before that date. Gutteridge testified that, by March 2009, AEP's channel partners had brought several customers to the Group and that "virtually all of the selling work, by then, was done." N.T., 6/13/2012, at 121. Therefore, the court reasonably awarded Appellees their share of the revenue generated from contracts by AEP's channel agents as of the time of

trial, regardless of whether the contracts were procured before or after March 2009.

For these reasons, we vacate the judgment and remand the matter to the trial court. Upon remand, the trial court shall adjust the judgment in a manner consistent with this memorandum.

Judgment vacated. Case remanded with instructions. Jurisdiction relinquished.

Judge Wecht joins the majority.

Judge Lazarus files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/17/2015